Leo James Terrell, Esq. (SBN 149693)
Tony Su, Esq. (SBN 262323)
Law Office of Leo James Terrell
11870 Santa Monica Blvd., Ste. 106-673
Los Angeles, CA 90025
P: (310) 478-3666 / F: (310) 478-3650
Email: Civil1975@aol.com

Attorneys for Plaintiff LaMont Tarkington

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LAMONT TARKINGTON;<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; LOS ANGELES COUNTY SHERIFF JIM MCDONNELL; LAUREN BROWN; JAMES MURREN; DONALD YOUNG; LAWRENCE BEACH ALLEN CHOI PC; and DOES 1-10 INCLUSIVE;<br><br>Defendants. | CASE NO.: CV 18-07636-CJC-JC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, FABRICATION OF EVIDENCE**<br><br>**(2) JOINT ACTION/CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, 42 U.S.C. §1983, FABRICATION OF EVIDENCE**<br><br>**(3) VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983, SUPERVISORIAL LIABILITY**<br><br>**(4) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, MALICIOUS PROSECUTION**<br><br>**(5) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *BRADY* VIOLATIONS**<br><br>**(6) JOINT ACTION/CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, 42 U.S.C. §1983, *BRADY* VIOLATIONS**<br><br>**(7) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *MONELL* VIOLATIONS**<br><br>**(8) VIOLATION OF CAL CIVIL CODE §§ 51 et. seq. AND 52.1**<br><br>**(9) VIOLATION OF STATE DUE PROCESS, CAL CONST. ART. I § 7(a)**<br><br>**(10) FALSE IMPRISONMENT**<br><br>**(11) NEGLIGENT HIRING, SUPERVISION, DISCIPLINING AND RETAINING DEPUTY SHERIFFS**<br><br>**DEMAND FOR JURY TRIAL** |

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1

# I.

## JURISDICTION AND VENUE

1.   This action is brought by Plaintiff LaMont Tarkington (hereinafter "Plaintiff") pursuant to 42 U.S.C. § 1983, California Constitution Art. I §7(a), and California Civil Code §§ 51 et. seq., and 52.1.

2.   This Court has jurisdiction under 28 U.S.C. § 1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. § 1983 and under 28 U.S.C. § 1331.

3.   The acts and omissions complained of commenced on December 14, 2005 and continued until June 4, 2018 within the Central District of California. Therefore, venue lies in the Central District of California pursuant to 28 U.S.C. § 1391.

# II.

## PARTIES

4.   At all times relevant herein, Plaintiff is a resident of the State of California and resided within the jurisdiction of the State of California.

5.   At all times relevant herein, Defendant Los Angeles County Deputy Sheriff Detective Lauren Brown (hereinafter "Brown") was employed by and working on behalf of the Los Angeles County Sheriff's Department, and resided within the jurisdiction of the State of California. In his capacity as a detective for the Los Angeles County Sheriff's Department, he actively participated in the investigation resulting in the prosecution and wrongful conviction of Plaintiff.  Defendant Brown is sued in his individual capacity.

6.   At all times relevant herein, Defendant Los Angeles County Deputy Sheriff Detective James Murren (hereinafter "Murren") was employed by and working on behalf of the Los Angeles County Sheriff's Department, and resided within the jurisdiction of the State of California. In his capacity as a detective for the Los Angeles County Sheriff's

**FIRST AMENDED COMPLAINT FOR DAMAGES**

2

Department, he actively participated in the investigation resulting in the prosecution and wrongful conviction of Plaintiff. Defendant Murren is sued in his individual capacity.

7.     At all times relevant herein, Defendant Los Angeles County Deputy Sheriff Sergeant Donald Young (hereinafter "Sergeant Young") was employed by and working on behalf of the Los Angeles County Sheriff's Department, and resided within the jurisdiction of the State of California. In his capacity as a sergeant for the Los Angeles County Sheriff's Department, he actively participated in the investigation resulting in the prosecution and wrongful conviction of Plaintiff. Defendant Sergeant Young is sued in his individual capacity.

8.     At all times relevant herein, Defendant Los Angeles County Sheriff Jim McDonnell (hereinafter "McDonnell") was employed by and working on behalf of the Los Angeles County Sheriff's Department, and resided within the jurisdiction of the State of California. In his capacity as Sheriff for the Los Angeles County Sheriff's Department, he participated and ratified the policies, customs and/or practices resulting in the investigation, prosecution and wrongful conviction of Plaintiff and other similarly situated criminal defendants. Defendant McDonnell is sued in his individual and official capacity.

9.     At all times relevant herein, Defendant County of Los Angeles (hereinafter "County") was a public entity, organized and existing under the laws of the State of California. The Los Angeles Sheriff's Department is, and at all times alleged herein, was an agency of Defendant County.

10.     Plaintiff is informed and believes and thereon alleges that Defendants sued herein as Does 1 through 10, inclusive, were employees of the Los Angeles County Sheriff's Department, and were at all times relevant times acting in the course and scope of their employment and agency. Each Defendant is the agent of the other. Plaintiff alleges that each of the Defendants named as a "Doe" was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will seek leave of this Court to

amend the Complaint to allege such names and responsibility when that information is ascertained.

## III.

## GENERAL ALLEGATIONS

11.    Plaintiff is informed and believes, and thereon alleges, that, at all times herein mentioned, each Defendant was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-defendants.

12.    Each paragraph of this Complaint is expressly incorporated into each cause of action which is a part of this Complaint.

13.    The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

## IV.

## FACTUAL ALLEGATIONS

## A.    INTRODUCTION

14.    This action arises from the investigation, prosecution, conviction, and incarceration of Plaintiff for crimes he did not commit.  Plaintiff was 33-years-old when arrested on December 14, 2005.  Plaintiff served at least twelve-years in jail and maximum-security prison, and was therefore subjected to severe limitations and indignities inherent in such settings.  Plaintiff experienced the fear and anxiety of being imprisoned with the State's most serious and violent offenders.  Most fundamentally, Plaintiff lost his youth and the years during which he could have gone to school, pursued a career, and raised a family.

15.    From his arrest and throughout his years in custody, Plaintiff proclaimed his innocence and relentlessly worked to procure his release by showing that a miscarriage of

justice occurred.   In pursuit of relief, he filed numerous appeals of his convictions. Plaintiff refused to accept any plea bargain, always maintaining his innocence.

16.   Plaintiff's resilience and knowledge that he was innocent allowed him to survive while in custody, but tragically, the best years of his life were taken from him based on the unconstitutional acts of officers of the Los Angeles County Sheriff's Department.   He was deprived of the rights and privileges our society holds most dear such as freedom and the ability to raise a family and pursue a career.

17.   Three masked men robbed a bank on the morning of December 14, 2005 at 10:14 A.M. in Palmdale, CA and took a large sum of money with bank dye packs designed to explode and spray red dye.   One of the bank tellers, Claudia Rissling, gave the FBI a witness statement and described the suspect who came to her counter and was wearing Converse shoes as a black male with "*medium complexion*."   Defendants Murren and Brown arrived at the robbery scene.   Crime scene investigators arrived at the scene to photograph shoe print impressions and measured it with a ruler.   When the getaway vehicle was found later that night on December 14, 2005, Defendant Brown went to search/inspect the getaway vehicle.

18.   Prior to the robbery and in October 2005, Plaintiff was absconding from Federal probation and changed his identity to Michael Skaggs to avoid going to prison for probation violation.   In November 2005, Plaintiff was pulled over and gave officers the false identity of Michael Skaggs.   He received a traffic ticket for driving without a license, open container, and possession of marijuana.   Plaintiff was released on his own recognizance and his decision to use the false identity worked as he was not arrested for Federal probation violation.   On the night of the robbery on December 14, 2005, Plaintiff offered a ride to Darris Allen.   Since Plaintiff was tired, he allowed Darris Allen to drive. That night at about 9:00 P.M., Plaintiff was pulled over by non-defendant deputies Wheeler, DiGiovanni and Diane Garcia Moreno.   Plaintiff was sitting in the passenger seat and Darris Allen was sitting in the driver's seat.   Plaintiff recalled that he was pulled over about a month ago and was successful in not getting arrested for the Federal

probation violation and being in possession of marijuana.  Thinking nothing of the situation, Plaintiff told the deputies that he had smoked marijuana and had some marijuana in the driver side door pocket.  Plaintiff then provided the officers with the identity of Michael Skaggs.  However, Plaintiff's attempt to avoid getting arrested for Federal probation violation this time around did not work as well because the deputies discovered money taken from a bank robbery earlier that morning in Darris Allen's possession. Furthermore, Plaintiff had an outstanding warrant for his failure to appear for the tickets he received a month earlier while. During the initial search of the car, the officers found over $3,000.00 of currency wedged between the driver's seat and center console and a large sum of currency in Darris Allen's jacket in the back seat.  The currency was moist, smelled of bleach, and appeared to have red coloring.  The deputies were informed by an FBI agent during the traffic stop that a bank robbery had taken place that morning and that the suspects had taken money with bank dye packs that had exploded and spread red dye on the money.  Under the circumstances, the deputies conducted a thorough search of Plaintiff's car, the back seat and rear hatch area for bank robbery evidence and items stained with red dye.  When the deputies thoroughly searched the Dodge Magnum, they did not find a clear plastic bag containing a black stocking and coins covered with red dye sitting underneath the jacket and in plain sight in the back seat, which they had removed currency with red coloring from.  The deputies never documented in their reports or testified to smelling pepper spray in the interior of the car or from any of the clothing found in the rear hatch area.  The deputies did not book into evidence a towel and t-shirt that was in the rear hatch area of the car.  The deputies did book Plaintiff's shoes into evidence because the bank robbery suspects had left shoe print impressions at the robbery scene.  Plaintiff's car was impounded and he was arrested for an outstanding warrant while Darris Allen was arrested for robbery.

19.    After Plaintiff was taken to the police station and fingerprinted, his real identity of LaMont Tarkington came up.  The officers found $201 on Plaintiff's person at the station, which Darris Allen had paid him for the ride.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

6

20.    The next day on December 15, 2005, Defendants Young, Murren and Brown obtained Plaintiff's criminal history and discovered he was involved in a prior bank robbery.   They then drove to the impound yard to search Plaintiff's car.   During the impound search, Defendants Young, Murren and Brown saw in plain sight underneath the jacket in the back seat a clear plastic bag containing a black stocking and coins covered in red dye.   The black stocking was believed to be used in the robbery.   Furthermore, they booked into evidence a towel and t-shirt that had red coloring on it.   Defendant Brown alleged that the interior of Plaintiff's car, the rear trunk area, the towel and t-shirt smelled of pepper spray, which he alleged was a contaminant from the exploded bank dye packs. Defendants Young, Murren and Brown took photographs of the clear plastic bag containing a black stocking and coins covered in red dye while it was in the rear seat. Defendants Young, Murren and Brown also took photographs of the towel and t-shirt showing red coloring on it.

21.    The arresting deputies Wheeler, DiGiovanni and Diane Garcia Moreno did not book into evidence any of the evidence Defendants Young, Murren and Brown found during their impound search on December 15, 2005 despite having conducted a thorough search for bank robbery evidence and items stained with red dye.   Deputies Wheeler, DiGiovanni and Diane Garcia Moreno never documented or testified to smelling pepper spray during their search of Plaintiff's car.

22.    In spite of official records showing Defendants Young, Murren and Brown searching Plaintiff's car on December 15, 2005, all three concocted a story that the search of Plaintiff's car took place eight days later on December 22, 2005.

23.    A jury convicted Plaintiff of bank robbery in 2007 based on the evidence Defendants Young, Murren and Brown found during the impound search on December 15, 2005.   He was convicted because of the clear plastic back containing a black stocking and coins covered with red dye, the towel, t-shirt and Claudia Rissling's identification. With respect to the towel and t-shirt, it is reasonable to infer that the jury believed when the bank dye pack exploded, it engulfed the robbers and the money with red dye.   Since

the towel and t-shirt were allegedly stained with red dye and smelled of pepper spray, the jury can reasonably conclude Plaintiff was one of the robbers.  The clear bag of coins containing a black stocking and coins covered with red dye sitting in the rear seat of Plaintiff's car further evidenced Plaintiff's guilt.  Lastly, bank teller Claudia Rissling testified that the robber who came to her counter and was wearing converse shoes was a black male with "*darker skin*" similar to Plaintiff.

24.    After Plaintiff's conviction, forensic testing established that there was no bank dye on the towel and t-shirt.  The prosecution's case unraveled and it became apparent that Plaintiff was convicted based on false evidence in the towel and t-shirt.  It also became apparent that the clear plastic bag containing a black stocking and coins covered in red dye was planted by Defendant Brown because deputies Wheeler, DiGiovanni and Diane Garcia Moreno found no such evidence during their thorough search of the back seat of Plaintiff's car.

25.    After Plaintiff's conviction, Plaintiff discovered Defendants were in possession of an FBI witness statement by bank teller Claudia Rissling where she described the robber who came to her counter and wearing converse shoes as a black male with "*medium complexion*."  Bank teller Claudia Rissling first identified Plaintiff as one of the robbers during the March 9, 2006 Preliminary Hearing while Plaintiff was sitting next to defense counsel and wearing prison garb.  She had changed her description of the skin tone of the robber who came to her counter and was wearing converse shoes to match the dark skin tone of Plaintiff, who was sitting right in front of her while wearing prison garb.  The FBI witness statement was in Defendants possession but was not turned over to Plaintiff before he was convicted in March 2007.

26.    After Plaintiff's conviction, Plaintiff discovered Defendant Brown had sent the shoe prints to the crime lab to be analyzed.  The results of the shoe print analyses were in Defendants possession and never turned over to Plaintiff before he was convicted in March 2007.

27.     In 2017, the Court of Appeals granted Plaintiff's writ of habeas corpus and reversed his convictions.  The Court of Appeals held:

> "the only item found on Tarkington that tied him to the robbery was the $200 in cash, which Allen said he gave to Tarkington as payment for the ride. ***The shirt and towel found in the back of the vehicle were thus used by the prosecution to help directly connect Tarkington to the robbery…   Thus, the shirt and towel were not merely cumulative pieces of evidence that tied Tarkington to the robbery without a viable explanation as to how they came into his possession; they were the only items to do so***….   Indeed, the case against Tarkington has been reduced to the false name he gave to law enforcement when pulled over— unsurprising given he was still on federal supervised release—and the alleged similarities between Tarkington's height, build, and skin color to one of the robbers.  Even if we apply the trial court's incorrect sufficiency of the evidence standard of review, ***the case against Tarkington is simply not strong enough to uphold***."

(See *In re Lamont T. Tarkington on habeas corpus*, Court of Appeal Second Appellate District Division One, 11/6/2017, B270141, at 34-36.)

28.     This instant action followed after the People dismissed the charges against Plaintiff in June 2018.

## B.     THE BANK ROBBERY IN PALMDALE, CALIFORNIA ON THE MORNING OF DECEMBER 14, 2005 AT 10:14 A.M.

29.     On December 14, 2005 at about 10:14 a.m. in Palmdale, California, three masked men robbed tellers at a Bank of America inside an Albertson's supermarket and took about $12,000.  Some of the money was "bait money", which are bills with recorded serial numbers, and included at least one dye pack designed to explode and spray dye. (**Exh 1** at bate stamp nos. 106-117; **Exh 3** at 32 ln. 27-28; 33 ln. 1-28.)

30.     On December 14, 2005, Defendants Brown and Murren went to the scene of the robbery.  (**Exh 6** at 1465 ln. 16-19.)  Defendant Murren contacted the Albertson's store manager for video footage.  (**Exh 1** at bate stamp nos. 106, 116.)

31.    Dep. Buckalew put out a radio broadcast, which included a suspect description, vehicle description, and last seen direction of travel.  (**Exh 1** at bate stamp no. 109.)  Dep. A. Hodge sent an MDT message to all LASD units giving a crime, vehicle, and suspect description.  (**Exh 1** at bate stamp no. 117.)

32.    Deputy Suarez interviewed Bateman inside the Bank of America, which was inside an Albertson's grocery store, and Bateman stated that she saw a white SUV in front of the grocery store and that it was unusual because it was unoccupied and running.  (**Exh 5** at 1175 ln. 7-20; **Exh 1** at bate stamp no. 120.)  Bateman told Deputy Suarez that she saw three male blacks running out of the Albertson's market, jump into the white SUV, and sped away from the location.  (**Exh 5** at 1175 ln. 21-28; 1176 ln. 1-24.)  Bateman memorialized the California license plate of the vehicle, 5NNw366, and gave it to a female employee who ran out of the store (the female employee was identified as bank manager Carias).  (**Exh 1** at bate stamp no. 120.)  Deputy Cheryl Suarez testified that her entire report concerning interviewing Bateman indicate it was only three male blacks. (**Exh 5** at 1177 ln. 16-26; see **Exh 1** at bate stamp no. 118-123.)  Witness statements from each of the children that accompanied Bateman (witnesses 5 to 8) described the three (3) suspects as male blacks ***with masks***.  (**Exh 1** at bate stamp no. 121 (*emphasis added*).)  A witness from one of the children accompanying Bateman, witness Williams, said he heard one of the suspects say, "come on come on," then another replied, "we got it baby."  (**Exh 1** at bate stamp no. 121.)  Witness Williams believed it was the driver speaking to the rear passenger as they were getting in the vehicle.  (**Exh 1** at bate stamp no. 121.)

33.    Deputy Hodge obtained a statement from bank teller Claudia Rissling. Rissling was working as a teller at counter number 4 and she saw three male blacks (identified as S/1 – S/3) enter the bank.  (**Exh 1** at bate stamp no. 109.)  Rissling said S/1 jumped over her counter, told her to "get the fuck on the floor", opened her teller drawers, began taking out money and putting it inside a bag he brought.  (**Exh 1** at bate stamp no. 110.)  Rissling saw S/2 jump over the counter number 1 and tell [bank teller]

Yessenia to get on the floor as well.  (**Exh 1** at bate stamp no. 110.)  Rissling said S/3 was standing outside the lobby and keeping time for the other two suspects.  (**Exh 1** at bate stamp no. 111.)  Claudia Rissling described suspect 1 as:  "MB / 25-28, 510-600 – 170 lbs wearing baggie gray dickie pants, dark blue windbreaker or sweatshirt, Converse tennis shoes, and a black mask – he also had a cover (NFD) on his head, jumped over her counter (#4) and told her to 'get the fuck on the floor.' She complied."  (**Exh 1** at bate stamp no. 110.)

34.  Claudia Rissling's witness statement to Deputy Hodge does not describe the complexion of the skin tone of suspect 1 who wore Converse tennis shoes and jumped over her counter #4.

35.  Deputy Hodge's report stated "Evi 2" was "crime lab footprints and photographs (see crime lab report)."  (**Exh 1** at bate stamp no. 108.)

36.  In December 2005, Sonja Nordstrom was the senior agent at the Lancaster FBI agency.  (**Exh 7** at 4 ln. 27-28; 5 ln. 1-3.)  On December 14, 2005 at or after 11:00, FBI agent Nordstrom responded to the bank robbery located in an Albertson's because she was advised it through dispatch, and she went there to be the case agent and primary investigator representing the FBI.  (**Exh 7** at 5 ln. 12-27.)  After she arrived [at the Bank of America], the Sheriff's Department was there.  (**Exh 7** at 5 ln. 28; 6 ln. 1-2.)  FBI agent Nordstrom's job was to interview victims, get a loss amount, collect the video, and coordinate with the sheriff's department.  (**Exh 7** at 6 ln. 3-8.)

37.  FBI agent Nordstrom interviewed four of the bank employees at the scene and she recalled the descriptions of the suspects as having masks or covering their faces, dark clothing, and heights varied.  (**Exh 7** at 7 ln. 17-28; 8 ln. 1-3.)  FBI agent Nordstrom interviewed victim Claudia Rissling who stated robber one was male black of ***medium complexion***, height 5'9" to 5'10", medium build, 170 to 180 pounds, 20 to 25, wearing a ***nylon black mask over face, had a hood, all baggie dark clothing, dark blue jacket, nylon, head length, dark gray dickie-type pants, blue Converse type shoes, gloves unknown***.  (**Exh 7** at 15 ln. 21-28; 16 ln. 1-28; 17 ln. 1-8 (*emphasis added*).)  Claudia

**FIRST AMENDED COMPLAINT FOR DAMAGES**

Rissling told FBI agent Nordstrom that robber number one was ***medium complexion***. (**Exh 7** at 17 ln. 23-26 (*emphasis added*).) Claudia Rissling told FBI agent Nordstrom about the ***medium complexion*** about robber number one because that is a question she would always ask. (**Exh 7** at 17 ln. 23-28; 18 ln. 1 (*emphasis added*).) FBI agent Nordstrom testified she verified that [Claudia Rissling] could see part of [robber no. 1]'s skin. (**Exh 7** at 18 ln. 2-4.) FBI agent Nordstrom believed [Claudia Rissling] stated she saw part of [robber no. 1]'s face and could see some skin. (**Exh 7** at 18 ln. 5-14.) FBI agent Nordstrom testified that [Claudia Rissling] was not able to give more specific descriptions regarding [robbers one and two] and that ***nobody was described as having a dark complexion***. (**Exh 7** at 18 ln. 18-24 (*emphasis added*).) FBI agent Nordstrom testified that robber one is the only person [Claudia Rissling] could describe the complexion of. (**Exh 7** at 18 ln. 25-27.) [Claudia Rissling] described robber 2 as black male, similar to robber no. 1, not specifically recalled. (**Exh 7** at 17 ln. 14-17.) [Claudia Rissling] stated she could only observe robber 3's head because he was in the lobby and she was behind the counter, and she described him as black male, 20, 25, 5'9" to 5'10", black nylon mask with hat or hood. (**Exh 7** at 17 ln. 17-22.)

38.     The FBI witness statement given by Claudia Rissling to FBI agent Nordstrom was in Defendants' possession (constructive or otherwise as it was a joint FBI/Los Angeles County Sheriff's Department investigation) and it was never turned over to Plaintiff before the March 9, 2006 Preliminary Hearing or the March 2007 trial.

## C.     THE SEARCH AND RECOVERY OF THE GETAWAY VEHICLE, A WHITE FORD EXPLORER ON DECEMBER 14, 2005, BY DEFENDANT BROWN

39.     Deputy Crosby responded to 4751 Minstrel St., Palmdale regarding a stolen vehicle that was running, parked in the street, and used in the bank robbery. (**Exh 1** at bate stamp no. 129.) Defendant Brown responded to the location and spoke to the informant at 4751 Minstrel St. who told him that she noticed the vehicle parked since

0900 hrs. the morning of 12-14-05.   (**Exh 1** at bate stamp no. 130.)  Deputy Crosby saw numerous bills totaling $124.00 in plain view in the backseat of the vehicle, which he recovered and booked at the Lancaster Sheriff's station.  (**Exh 1** at bate stamp no. 129.)

40.    Deputy Crosby did not state anything unusual about the money or smelling pepper spray in his report regarding the getaway vehicle.  (**Exh 1** at bate stamp nos. 129-130.)

41.    Deputy Crosby testified that on December 14, 2005 at 6:44 in the evening, he responded to a call regarding a stolen white Ford Explorer less than one mile from the Albertson's.  (**Exh 4** at 655 ln. 3-16; 659 ln. 1-6.)  Deputy Crosby was the first deputy to arrive at the vehicle.  (**Exh 4** at 661 ln. 3-5.)  Deputy Crosby testified that he approached the vehicle, noticed that it was still running, looked inside, and saw miscellaneous denominations of US currency inside the vehicle on the floor board and on the seat.  (**Exh 4** at 656 ln. 14-21.)  Deputy Crosby testified that he saw red dye or ink inside the vehicle. (**Exh 4** at 657 ln. 3-10.)  Deputy Crosby testified that when the detective arrived, he was instructed to go ahead and recover the currency.  (**Exh 4** at 663 ln. 19-23.)  Deputy Crosby testified that he put on gloves, went inside the vehicle, recovered about $124 in the back seat and floor of the rear seat, and booked it into evidence.  (**Exh 4** at 657 ln. 16-25; 662 ln. 9-15.)  Deputy Crosby testified that he most likely would have noted in his report anything unusual, such as if the money was pink.  (**Exh 4** at 658 ln. 15-28.)  Deputy Crosby testified that he came into contact with the money and would have noted in his report if the money had any unusual characteristics.  (**Exh 4** at 664 ln. 11-26.)

42.    On December 14, 2005, Defendant Brown recovered a 2005 Ford Explorer connected to the bank robbery earlier in the day.  (**Exh 3** at 76 ln. 1; 77 ln. 1-13.) Defendant Brown looked inside the vehicle and saw some US currency in the rear seat towards the driver's seat.  (**Exh 4** at 764 ln. 12-20.)  He saw red dye and a line on the rear seat and along the passenger rear door.  (**Exh 4** at 764 ln. 23-28; 765 ln. 1-7.)

43.    Defendant Brown did not state anything in his report about smelling pepper spray in the getaway vehicle.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

13

44.    Based on his training an experience, Defendant Brown explained the [robbers] would get a bucket or ice chest, fill it with water to some degree, put the money into the water to help diffuse the red dye when it explodes because they anticipate a dye pack.  (**Exh 4** at 766 ln. 7-20.)  According to Defendant Brown, it would spread dye to the other money when it explodes in the car, the car is going to fill up with pepper spray gas and dye so that the [robbers] will not be able to drive any further.  (**Exh 4** at pg. 766 ln. 21-26.)  Defendant Brown experienced where the [robbers] do not put it in anything, and when you get to the vehicle and the dye pack explodes, the entire vehicle is covered with the red dye and the odor of the pepper spray is very heavy.  (**Exh 4** pg. 766 ln. 27-28; 767 ln. 1-3.)  Defendant Brown has seen a vehicle drive down the street with a dye pack exploding, and the entire vehicle is covered with the dye and O.C., oyluim capsiun [sic] that's used there.  (**Exh 6** at 1476 ln. 25-28; 1477 ln. 1-4.)

45.    Plaintiff is informed and believes, and based thereon alleges, that Defendant Brown recovered and seized a clear plastic bag containing a black stocking believed to be used in the bank robbery and coins covered in red dye when he was searching the getaway vehicle, a white Ford Explorer, on December 14, 2005, which he later planted in the rear seat of Plaintiff's Dodge Magnum the next day on December 15, 2005 during the impound search.

**D.    THE TRAFFIC STOP AND FIELD SEARCH OF THE DODGE MAGNUM BY NON-PARTY DEFENDANTS SHERIFF DEPUTIES ON DECEMBER 14, 2005 AT 9:00 P.M. EAST OF NORMANDIE ON CENTURY BLVD. IN LOS ANGELES, CALIFORNIA 60 TO 70 MILES FROM THE ROBBERY SCENE**

46.    On October 20, 2005, Plaintiff applied for a driver's license under the name "Michael Skaggs."  (**Exh 2** at bate stamp nos. 281-282.)

47.    Plaintiff changed his identity because he was absconding from Federal probation and did not want to be arrested and go to prison.

48.    On November 6, 2005, Plaintiff received traffic citations while using the name "Michael Skaggs" for driving without a license, open container, and possession of less than 10 ounces of marijuana and he signed it promising to appear at LAX Court on December 6, 2005.  (**Exh 2** at bate stamp no. 283.)   Plaintiff was not arrested and released on his own recognizance.

49.    Since the officer could not identify Plaintiff as LaMont Tarkington on November 6, 2005, Plaintiff was successful in his first attempt on November 6, 2005 to avoid getting arrested for his probation violation.  Thus, when he was pulled over on December 14, 2005 by Deputies Wheeler, DiGiovanni, and Diane Garcia Moreno, he again attempted to avoid getting arrested for Federal probation violation by telling the deputies that his name is "Michael Skaggs," telling the deputies that he had smoked some marijuana, and that he had some marijuana on the driver side door.

50.    On December 14, 2005, Deputy Diane Garcia Moreno testified she had partnered up with Deputies DiGiovanni and Wheeler who were not her regular partners because her regular partner was not in that night.  (**Exh 5** at 793 ln. 14-28.)

51.    On December 14, 2005 at 9:00 in the evening, Deputy Wheeler conducted a traffic stop of a Dodge Magnum with Deputy DiGiovanni and Deputy Diane Garcia Moreno east of Normandie on Century Blvd., which is a little over an hour-long drive from the bank and Lancaster or Palmdale; and 60 to 70 miles from the bank.  (**Exh 4** at 707 ln. 13-27; 714 ln. 25-28; 715 ln. 1-16; **Exh 1** at bate stamp no. 144.)

52.    Deputy DiGiovanni testified Darris Allen was in the driver's seat at the time of the traffic stop.  (**Exh 4** at 727 ln. 15-18.)  Deputy DiGiovanni contacted the driver Darris Allen and Deputy Wheeler contacted the passenger Michael Skaggs.  (**Exh 1** at bate stamp no. 145; **Exh 4** at 708 ln. 25-28; 709 ln. 1-20.)

53.    Michael Skaggs informed Deputy Wheeler that he had Darris Allen drive because he smoked too much weed, was tired, and that there was weed in a bottle in the driver's door pocket.  (**Exh 1** at bate stamp no. 145.)  Deputy Wheeler had Michael

Skaggs exit the vehicle and detained him for a narcotics investigation.  (**Exh 1** at bate stamp no. 145.)

54.   Deputy Wheeler ran a search on Michael Skaggs and found that he had an arrest warrant for 12500(a) CVC [i.e. driving without a license].  (**Exh 1** at bate stamp no. 145.)

55.   Deputy Diane Garcia Moreno testified that she searched the Dodge Magnum with Deputies Wheeler and DiGiovanni on December 14, 2005.  (**Exh 5** at 833 ln. 2-7.)

56.   During the search, Deputy DiGiovanni retrieved a small pill bottle (Ev-2) containing a green plant-like substance resembling marijuana (Ev-1) from the driver's door pocket.  (**Exh 1** at bate stamp no. 145.)

57.   Deputies DiGiovanni and Diane Garcia Moreno searched the vehicle for additional narcotics or contraband, and they conducted an inventory search for vehicle impound.  (**Exh 1** at bate stamp no. 145.)

58.   After removing the driver [Darris Allen] out of the vehicle, Deputy Giovanni looked inside the car, recovered money in a plastic bag stuffed between the driver's seat and center counsel from inside the vehicle that had red dye all over it, appeared to be moist, and smelled like bleach.  (**Exh 4** at 721 ln. 6-28.)  The black plastic bag contained a large sum of US currency over $3,000.00 stained with red dye, was taken out of the vehicle, and given to Deputy Wheeler.  (**Exh 4** at 710 ln. 1-8; 711 ln. 3-4.)

59.   The police reports note Deputy DiGiovanni found a large amount of US currency (Ev-3) in a black plastic bag (Ev-10) stuffed between the driver's seat and the center counsel with red dye on almost all of it.  (**Exh 1** at bate stamp no. 145.)

60.   Deputy Diane Garcia Moreno found in the back seat of the vehicle a large amount of money in a jacket pocket with red dye on almost all of the bills, which was moist and smelled of bleach.  (**Exh 1** at bate stamp no. 145.)

61.   Deputy Diane Garcia Moreno testified she searched the rear back seat of the vehicle and recovered a large amount of US currency containing red dye from inside a black jacket.  (**Exh 5** at 794 ln. 11-21.)  Deputy Diane Garcia Moreno testified that the

**FIRST AMENDED COMPLAINT FOR DAMAGES**

16

money appeared bleached and had a small scent of bleach.  (**Exh 5** at 795 ln. 13-18.)  When she saw the red dye, Deputy Diane Garcia Moreno recognized the significance of it as "dye pack as a result of a bank robbery" based on her training and experience.  (**Exh 5** at 830 ln. 14-28.)

62.    Deputy Diane Garcia Moreno called FBI agent Katie and was informed that the money was more likely taken from a bank robbery, that a robbery in Palmdale was committed earlier today, that bait money was taken during the robbery and exploded, that a stolen Ford Explorer was recovered near the scene of the robbery, and that inside the vehicle on the back seat was red dye from an exploded "bait pack."  (**Exh 1** at bate stamp no. 146.)

63.    Deputy Diane Garcia Moreno testified she had called the FBI during the traffic stop and the deputies were informed that a robbery had taken place in Palmdale earlier that day.  (**Exh 5** at 1376 ln. 13-24.)

64.    Deputy Wheeler testified that while out in the field and still out on the street, he learned through a cell phone call that there had been a robbery in Palmdale.  (**Exh 5** at 1398 ln. 24-28; 1399 ln. 1-2.)

65.    Deputy Wheeler testified that he was the senior deputy at the scene.  (**Exh 5** at 1375 ln. 22-24.)  Deputy Wheeler was present when Deputies DiGiovanni and Diane Garcia Moreno searched the vehicle.  (**Exh 4** at 709 ln. 21-24.)

66.    Deputy Wheeler testified based on finding the red money, red dye on money and the phone call, the vehicle stop became serious.  (**Exh 5** at 1399 ln. 22-25.)  Since it was a serious case, Deputy Wheeler wanted to do a thorough search of the vehicle.  (**Exh 5** at 1400 ln. 28; 1401 ln. 1-3.)

67.    Deputy Wheeler testified that the car was being searched for evidence that might relate to bank robbery.  (**Exh 5** at 1394 ln. 14-17.)

68.    Deputy Wheeler testified that he directed [the other deputies] to look for anything that would be used in a robbery.  (**Exh 5** at 1375 ln. 25-28.)

69.    Deputy Wheeler testified that doing a very thorough search was very important, including going through the trunk area.  (**Exh 5** at 1401 ln. 19-25; 1402 ln. 1-6.)

70.    Deputy Wheeler testified that the search maybe lasted 20 to 25 minutes. (**Exh 5** at 1376 ln. 28; 1377 ln. 1-4.)

71.    Deputy Wheeler testified that with the facts that he had that night and with the money placed in the bag, he would have had the deputies look for clothing possibly with dye stains on it.  (**Exh 5** at 1381 ln. 14-28; 1382 ln. 1-5.)

72.    When Deputy Wheeler was asked with the light conditions he had, could he have seen the stains on People's 59, he testified, "Yeah, they look pink, almost like koolaid."  (**Exh 5** at 1382 at ln. 8-13.)

73.    Deputy Diane Garcia Moreno testified that she conducted a thorough search of the vehicle.  (**Exh 5** at 799 ln. 8-15; 801 ln. 22-24.)  Deputy Diane Garcia Moreno testified she thoroughly looked around the back seat and the floorboards of the back seat, and the only thing she recalled seeing or finding of significance was the dark jacket. (**Exh 5** at 802 ln. 21-28.)  Deputy Diane Garcia Moreno testified that she observed Deputy DiGiovanni searching the back seat and rear compartment of the Dodge Magnum.  (**Exh 5** at 833 ln. 27-28; 834 ln. 1-3.)  Deputy Diane Garcia Moreno testified that she and the other two deputies searched through the back seat, the rear compartment, and trunk area of the Dodge Magnum.  (**Exh 5** at 828 ln. 4-16.)  Deputy Diane Garcia Moreno testified that she and the other two deputies search all interior areas of the Dodge Magnum.  (**Exh 5** at 828 ln. 24-27.)  Deputy Diane Garcia Moreno looked at various times in the rear hatch area and back area of the Dodge Magnum.  (**Exh 5** at 833 ln. 19-21.)  Deputy Diane Garcia Moreno testified she did not recall anything else of significance found in the back seat beside the money in the jacket.  (**Exh 5** at 801 ln. 8-21.)  Deputy Diane Garcia Moreno testified that she did not recall seeing in the back seat a bag of coins with a stocking around it.  (**Exh 5** at 803 ln. 11-15.)

74.    Based on the robbery in Palmdale earlier in the day, Darris Allen and Michael Skaggs were in a car with money stained with red dye possibly taken from a bank robbery, coupled with Darris Allen's statements regarding how he obtained the money, the deputies formed the opinion Darris Allen was involved in the robbery, arrested Darris Allen for Penal Code sec. 211 [i.e. robbery], and arrested Michael Skaggs for an outstanding warrant [i.e. driving without a license].  (**Exh 1** at bate stamp nos. 146; **Exh 2** at 176.)

75.    The [Dodge Magnum] was impounded and held as evidence at B & H Tow. (**Exh 1** at bate stamp no. 146.)

76.    Deputies Wheeler, DiGiovanni and Diane Garcia Moreno noted the following evidence was recovered from the field search and arrest of Darris Allen and Michael Skaggs:

> Ev-1:  Narco envelope containing a green leafy substance resembling marijuana Lab#J699162.
> Ev-2:  One brown plastic container with white top.
> Ev-3:  US currency totaling $3098.00, with red dye on the bills.
> Ev-4:  (2) US $20.00 bills with red dye on them.
> Ev-5:  US currency totaling $201.00 with red dye on the bills, taken from S/Skaggs.
> Ev-6:  (1) silver cell phone belonging to S/Skaggs.
> Ev-7:  (1) black and silver "Motorola" cell phone, and (1) silver and black "Motorola" "1860" belonging to S/Allen.
> Ev-8:  Bag containing (1) pair of black/blue tennis shoes with "melo" on heel belonging to S/Skaggs.
> Ev-9:  Bag containing (1) pair white "ADIDAS" tennis shoes
> Ev-10:  (1) black plastic bag
> Ev-11:  Admonition and Waiver forms signed by S/Skaggs and S/Allen

(**Exh 1** at bate stamp no. 144.)

77.    Deputies Wheeler, DiGiovanni, and Diane Garcia Moreno's report(s) note Plaintiff's and Darris Allen's shoes were seized as evidence during their arrest on

December 14, 2005.  (See **Exh 1** at bate stamp nos. 144, 148 ("Ev – 8:  a bag containing (1) pair of black/blue tennis shoes with 'melo' on heel belonging to S/Skaggs [i.e. Plaintiff]; Ev-9:  Bag containing (1) pair white 'ADIDAS' tennis shoes").)

78.    Deputy Wheeler testified the Melo shoes (ev8) were taken off Plaintiff after the traffic stop and Plaintiff was wearing them. (**Exh 5** at 1411 ln. 11-28; 1412 ln. 1-4.)

79.    Deputies Wheeler, DiGiovanni, and Diane Garcia Moreno's report(s) note the money recovered from the search of Dodge Magnum had red dye, smelled of bleach and was moist; however, their report(s) do not reference the smell of pepper spray from the money or interior of the Dodge Magnum nor do it reference recovery of any towel, t-shirt, or clear plastic bag containing a black stocking with coins covered with red dye as evidence from the field search of the Dodge Magnum on December 14, 2005.  (**Exh 1** at 144-148; **Exh 2** at 174-176.)

80.    On December 14, 2005, Deputy DiGiovanni filled out a Vehicle Report regarding the impound, condition and items of the Dodge Magnum.  (**Exh 1** at bate stamp nos. 155-156.)  Deputy DiGiovanni noted that there were items in the front and back seat. (**Exh 1** at bate stamp nos. 155-156.)

81.    Deputy Wheeler testified that he did not recall recovering a bag of change or anything like that.  (**Exh 5** at 1376 ln. 5-9.)

82.    Deputy Wheeler testified that the supplemental report did not list a shirt with what appeared to be reddish color on it. (**Exh 5** at 1395 ln. 26-28; 1396 ln. 1-9.)

83.    Deputy Wheeler testified that his report reflects quoting Allen saying that the money was all his.  (**Exh 5** at 1414 ln. 25-28; 1415 ln. 1-5.)

84.    Deputy Diane Garcia Moreno testified that Deputy Wheeler authored a report of the items found and she reviewed it to make sure it was accurate because various deputies recovered various items in different places.  (**Exh 5** at 803 ln. 1-10; 803 ln. 13-22.)  Deputy Diane Garcia Moreno testified that she went through the sheriff's agency and received training to take an investigative or supplemental report.  (**Exh 5** at 805 ln. 10-17.)  Deputy Garcia agreed that it is important for a deputy to document in a

**FIRST AMENDED COMPLAINT FOR DAMAGES**

20

written report anything that is a material fact or something of importance as part of her training.  (**Exh 5** at 805 ln. 10-28.)  Deputy Diane Garcia Moreno testified that the report by Deputy Wheeler references a jacket with bills in the back seat but not any kind of coins.  (**Exh 5** at 803 ln. 23-28; 804 ln. 1-28; 805 ln. 1-8.)

85.     Deputy Diane Garcia Moreno testified that she is familiar with the smell of pepper spray and that she smelled bleach but not pepper spray from the money she came in contact with.  (**Exh 5** at 806 ln. 14-25.)  Deputy Diane Garcia Moreno testified she was trained to deal with pepper spray.  (**Exh 5** at 823 ln. 27-28; 824 ln. 1-2.)  Deputy Diane Garcia Moreno testified that she has been hit by pepper spray before.  (**Exh 5** at 824 ln. 16-17.)  Deputy Diane Garcia Moreno testified that if she gets pepper spray on her clothes, she was taught to wash it off.  (**Exh 5** at 824 ln. 24-28; 825 ln. 1-7.)  Deputy Diane Garcia Moreno testified that the number one that she does when pepper spray gets in the eyes or hands or anything, she summons fire, she seeks medical attention for the individual.  (**Exh 5** at 824 ln. 3-9.)  Deputy Diane Garcia Moreno did not recall having to seek medical aid/attention as a result of the search.  (**Exh 5** at 828 ln. 28; 829 ln. 1-5.)  Deputy Diane Garcia Moreno testified that she did not recall having to wash her uniform because it was contaminated in some way as a result of the search.  (**Exh 5** at 829 ln. 20-27.)

86.     Deputy Diane Garcia Moreno testified that she did not indicate in the report as evidence from the search of the car a white tank top with red dye and pepper spray.  (**Exh 5** at 831 ln. 1-28; 832 ln. 1-14.)  Deputy Diane Garcia Moreno testified she did not book the personal items or clothing at the time because she and the other deputies did not associate them with the crime that had occurred.  (**Exh 5** at 835 ln. 13-18.)  Deputy Diane Garcia Moreno testified that the items in the trunk of the car and the clothing did not appear to be something involved in a crime.  (**Exh 5** at 835 ln. 27-28; 836 ln. 1-5.)  Deputy Diane Garcia Moreno testified that had she found clothing in the rear compartment that had red dye or appeared to be red dye on it, she possibly would have considered it potential evidence.  (**Exh 5** at 837 ln. 17-23.)  Deputy Diane Garcia Moreno

testified that if she found in the car a white tank top that had what appeared to be red dye on it and the smell of pepper spray, that would be the kind of items she took into evidence.  (**Exh 5** at 838 ln. 10-15.)

87.     Deputy Diane Moreno Garcia testified that when she searched Plaintiff's person at the station, she found $201 in currency in his pants pocket.  (**Exh 5** at 796 ln. 1-28.)

88.     Deputy Diane Moreno Garcia testified that the money she came into contact with that night did not have the smell of pepper spray.  (**Exh 5** at 806 ln. 19-25.)

89.     Deputy Diane Garcia Moreno indicated recovering $201 in US currency (EV-5) from Michael Skaggs during the booking process and Michael Skaggs said it was given to him by Darris Allen.  (**Exh 1** at bate stamp no. 147.)

90.     The deputies indicted that after Michael Skaggs was booked, his fingerprint identification came back to the name of Lamont Tarkington.  (**Exh 1** at bate stamp no. 147.)

91.     Darris Allen testified that the money in the black bag, the jacket, that the money in the jacket, and that the money that was found on Plaintiff at the station were all his.  (**Exh 5** at 1188 ln. 16-28.)

92.     The arresting deputies did not find any clear plastic bag containing a black stocking and coins covered with red dye sitting underneath the jacket in the back seat.

93.     The arresting deputies did not find the towel and t-shirt allegedly stained with red dye and smelling of pepper spray to be related to the bank robbery.

94.     The arresting deputies did not document or testify to smelling the scent of pepper spray during their search of the Dodge Magnum.

///

///

///

E.   **POLICE REPORTS OF IMPOUND SEARCH OF DODGE MAGNUM ON DECEMBER 15, 2005 BY DEFENDANTS SERGEANT YOUNG, MURREN AND BROWN**

95.   On December 14, 2005, Deputy DiGiovanni impounded the Dodge Magnum at B & H in Inglewood, CA.  (**Exh 1** at bate stamp nos. 155-156.)

96.   On December 15, 2005 at 8:24, Defendant Murren obtained a copy of Plaintiff's criminal history.  (**Exh 2** at bate stamp no 202.)

97.   Defendant Murren informed his co-conspirators that Plaintiff has an extensive criminal history while they were going to the tow-yard to conduct the impound search of Plaintiff's car on December 15, 2005.

98.   Defendant Brown wrote a supplemental report dated December 30, 2005. (**Exh 1** at bate stamp no. 153.)  According to this report, Defendants Sergeant Young, Murren and Brown drove to the Lennox Sheriff's station, took evidence (ev-2 through ev-11) from the property room, and booked it into the evidence room at the Lancaster Sheriff's Station.  (**Exh 1** at bate stamp no. 153.)  Defendants Sergeant Young, Murren and Brown went to B & H Towing to process the 2005 Dodge Magnum and met with Alex Strouzer, Sheriff's Crime Lab, at the location.  (**Exh 1** at bate stamp no. 153.)  They found (1) numerous articles of clothing (ev-19 and 20) in the rear of the vehicle; and (2) clear plastic bag (ev-8) containing a black stocking (ev-7) with misc. U.S. coins (ev-21) covered with red dye, which were booked into Lancaster Sheriff's station.  (**Exh 1** at bate stamp no. 153.)

99.   Photographs of the Dodge Magnum and its contents were taken, which included photographs of the towel and t-shirt with red coloring, a clear plastic bag with a black stocking and coins covered in red dye.  (**Exh 2** at bate stamp nos. 289-309; **Exh 9** at 16-17.)

100.   Defendant Brown's December 30, 2005 report does not reference the scent of pepper spray from the search of the Dodge Magnum or handling of any evidence, such as the miscellaneous clothing, towel, t-shirt, coins, and black stocking.  (**Exh 1** at bate

**FIRST AMENDED COMPLAINT FOR DAMAGES**

23

stamp no. 154.)  Defendant Sergeant Young approved Defendant Brown's December 30, 2005 report.  (**Exh 1** at bate stamp no. 154.)

101.   The Field Investigation Log shows that on December 15, 2005, CSI Investigator was "**NOTIFIED**" at "**1015**", "**ARRIVE**" at "**1100**", "**END**" at "**1330**", and requested by Defendant Murren regarding "**PRINT VEH & PHOTOGRAPH CLOTHING FOR ID PURPOSES PHOTOGRAPH ANY RED DYE ALSO IN VEH & CLOTHING**" of the Dodge Magnum located B & H Towing, 1149 S. La Brea Ave., Inglewood.  (**Exh 10** (*emphasis added*).)

102.   Defendant Brown's supplemental report dated December 30, 2005 documented recovery of numerous articles of clothing and a black stocking with coins covered in red dye in the back seat during his impound search of the Dodge Magnum on December 15, 2005.  Defendant Sergeant Young, Murren and Brown took photographs of a towel and t-shirt, the clear bag containing a black stocking and coins covered with red dye during the impound search on December 15, 2005.  However, none of the arresting deputies, Wheeler, DiGiovanni, and Diane Garcia Moreno, documented, saw or seized any clothing, towel, t-shirt, black stocking, coins covered with red dye during their search of the Dodge Magnum for bank robbery evidence on December 14, 2005.

## F.   DEFENDANT SERGEANT YOUNG'S IMPOUND SEARCH OF DODGE MAGNUM

103.   Defendant Sergeant Young was Defendants Murren and Brown's supervisor, he assigned the [Tarkington] case to Detective Brown, and he facilitated and supervised the search of the Dodge Magnum.  (**Exh 6** at 1427 ln. 7-28; 1428 ln. 1-11.)

104.   Defendant Sergeant Young went with Defendants Murren and Brown from the Palmdale Station to the tow yard to search the Dodge Magnum.  (**Exh 6** at 1423 ln. 13-28; 1424 ln. 1-3; 1427 ln. 4-8.)

105. Defendants Sergeant Young, Brown and Murren met the criminalist at the [tow yard] and the B & H employee took them to the garage area, unlocked the garage door, and showed them the car.  (**Exh 6** at 1427 ln. 19-22.)

106. Defendant Sergeant Young saw a black jacket in the back seat.  (**Exh 6** at 1429 ln. 7-11.)  When the black jacket was moved or removed from the backseat of the car, Defendant Sergeant Young saw a plastic like a Ziploc baggy full of coins with red powder around all the coins and on the bag.  (**Exh 6** at 1429 ln. 19-27.)  Defendant Sergeant Young saw some coins inside the bag and stocking.  (**Exh 6** at 1440 ln. 9-17.)

107. Defendant Sergeant Young saw the trunk area looked like, "a lot of clothes, pants, shirts, shoes, all kinds of different clothes.  It was full of clothes."  (**Exh 6** at 1431 ln. 6-11.)  Defendant Sergeant Young saw the detectives look through the clothes.  (**Exh 6** at 1431 ln. 12-21.)  Defendant Sergeant Young saw the criminalist and Defendant Brown handling the towel and a shirt that were removed.  (**Exh 6** at 1432 ln. 27-28; 1433 ln. 1-10.)  Defendant Sergeant Young saw a white towel with red stains on it and a shirt that was stained more found in the hatchback area.  (**Exh 6** at 1432 ln. 7-28; 1433 ln. 1-6.)

108. Defendant Sergeant Young was [at the tow yard] for an hour and a half, maybe two hours from the time he arrived to the time he left.  (**Exh 6** at 1436 ln. 16-20.)  Defendant Sergeant Young arrived [at the tow yard] and left with Defendants Brown and Murren.  (**Exh 6** at 1436 ln. 21-23.)

109. Defendant Sergeant Young signs off on, reads and reviews the reports his detectives write.  (**Exh 6** at 1433 ln. 11-14.)

110. Defendant Sergeant Young approved Defendant Brown's supplemental report dated December 30, 2005 regarding the impound search of the Dodge Magnum on December 15, 2005.  The supplemental report dated December 30, 2005 lists the following items were recovered from the impound search: (1) numerous articles of clothing (ev-19 and 20) in the rear of the vehicle; and (2) clear plastic bag (ev-8) containing a black stocking (ev-7) with misc. U.S. coins (ev-21) covered with red dye,

which were booked into Lancaster Sheriff's station.   The supplemental report dated December 30, 2005 do not identify the towel and t-shirt being booked into evidence nor does it identify who recovered each piece of evidence during the impound search on December 15, 2005.

## G.   DEFENDANT MURREN'S IMPOUND SEARCH OF DODGE MAGNUM

111.   On December 15, 2005 at 08:24, Defendant Murren obtained a record of Plaintiff's criminal history.  (**Exh 2** at bate stamp no. 202.)

112.   On December 15, 2005 at 07:20:53, Defendant Murren obtained Plaintiff's criminal record and circled the 1998 sentence for armed bank robbery.  (**Exh 2** at bate stamp nos. 218, 224.)

113.   Defendant Murren drove down [to the tow yard] with Defendants Brown and Sergeant Young.  (**Exh 6** at 1454 ln. 3-7.)  When Defendant Murren first got [to the tow yard], Defendant Brown was leading and doing the search, and he was observing Defendant Brown.  (**Exh 6** at 1448 ln. 23-28; 1449 ln. 1-2.)  A criminalist from the crime lab was [at the tow yard] to do fingerprint work and some photo work.  (**Exh 6** at 1455 ln. 16-26.)

114.   After the jacket was moved, Defendant Murren saw underneath it a large bag of coins on the back seat as shown on People's 74.  (**Exh 6** at 1448 ln. 8-19; **Exh 11**, People's 74.)

115.   Defendant Murren believed a t-shirt of some kind and a towel with red stains on it were removed in the trunk.  (**Exh 6** at 1452 ln. 2-6.)  Defendant Murren saw red dye stains on the towel and t-shirt.  (**Exh 6** at 1454 ln. 25-28; 1455 ln. 1-2.)

116.   The prosecution introduced at trial People's 59 (i.e. the towel and t-shirt), which were the items Defendant Murren saw in the back of the car.  (**Exh 6** at 1452 ln. 7-12; **Exh 12**, Los Angeles Superior Court Exhibit Receipt at sheet 5 of 10.)

117.   Defendant Murren did not draft any report regarding his participating in the impound search of the Dodge Magnum on December 15, 2005.

## H.   DEFENDANT BROWN'S IMPOUND SEARCH OF DODGE MAGNUM

118.   Defendant Brown was assigned to investigate the [bank robbery] and searched the Dodge Magnum.  (**Exh 4** at 742 ln. 14-16.)

119.   Defendant Brown investigated hundreds of robberies and about 30 bank robberies.  (**Exh 4** at 765 ln. 8-16.)  Defendant Brown received training on investigating bank robberies.  (**Exh 4** at 765 ln. 20-28; 766 ln. 1-6.)

120.   Defendant Brown searched the Dodge Magnum at "9-ish, 10:00" A.M. at B & H Towing.  (**Exh 4** at 771 ln. 12-19.)

121.   The criminalist photographed the vehicle inside and outside, and some of the clothing [Defendants Brown, Sergeant Young and Murren] thought may have been used during the robbery were taken out of the vehicle and laid on the ground to be photographed.  (**Exh 4** at 742 ln. 24-28; 743 ln. 1-7.)

122.   Defendant Brown was present when photographs of the [Dodge Magnum] were taken.  (**Exh 4** at 742 ln. 17-23.)  Defendant Brown saw the criminalist and Defendant Murren take photographs.  (**Exh 6** at 1471 ln. 19-24.)

123.   While searching the Dodge Magnum, Defendant Brown did not smell pepper spray much in the front but he could smell pepper spray when he moved the clothing and stuff in the back.  (**Exh 4** at 771 ln. 12-25.)

124.   Defendant Brown personally went through things and taking an item out at a time, especially the clothing in the back, looking to see if it matched any of the clothing that they thought were used in the robbery.  (**Exh 6** at 1459 ln. 9-17.)

125.   Defendant Brown saw People's 59 the towel and t-shirt in the rear hatch of the Dodge Magnum.  (**Exh 6** at 1462 ln. 25-28; 1463 ln. 1-3.)

126.   Defendants Brown, Sergeant Young, and Murren were senior detectives and have worked many robberies.  (**Exh 6** at 1510 ln. 17-19.)

127.   Defendants Brown, Sergeant Young, and Murren looked at the towel and t-shirt and all came to the same conclusion that it all appeared to be red dye from the dye pack.  (**Exh 6** at 1510 ln. 14-25.)

128.   Defendant Brown found in the vehicle and booked into evidence a short nylon stocking tied at the top and contained $59 in coins.  (**Exh 4** at 753 ln. 17-24.) Defendant Brown smelled contaminant or pepper spray and saw red dye from a bank dye pack on People's 57 the change, which was found in the rear passenger seat.  (**Exh 4** at 754 ln. 11-25.)

129.   Defendant Brown saw the t-shirt looked as though it had the same red color as on the coins.  (**Exh 4** at 756 ln. 1-5.)  Defendant Brown smelled pepper spray and saw red dye stain coloring on the tank top and towel, which is the same coloring as the change.  (**Exh 4** at 756 ln. 15-28; 757 ln. 1-17; 757 ln. 19-28; 758 ln. 1-2.)  Defendant Brown found the shirt in the rear hatch area of the car, as was a towel that had a few spots with the same red dye coloring.  (**Exh 4** at 758 ln. 3-18.)

## I.   THE FELONY COMPLAINT WAS FILED ON DECEMBER 15, 2005 BASED UPON THE DECLARANT AND COMPLAINANT "LAUREN BROWN"

130.   Later that same day of December 15, 2005 after Defendants Sergeant Young, Murren and Brown finished their impound search of the Dodge Magnum, planting evidence, taking misleading photographs, and fabricating evidence, Defendant Brown informed the People of the bank robbery evidence that he had observed and collected from the Dodge Magnum.  The People relied on Defendant Brown as the Declarant and Complainant to file the Felony Complaint against Plaintiff on December 15, 2005.

131.   The Felony Complaint charging Plaintiff for the robbery and burglary was filed at the Superior Court on December 15, 2005 at 3:07 PM and it was based on declarant Defendant Brown.  The Los Angeles Superior Court official filing stamp on the

first page of the Felony Complaint, which charged Plaintiff with felony robbery and burglary, stated, "**FILED LA SUPERIOR COURT 2005 DEC 15 PM 3:07 JOHN A. CLARKE, CLERK**" based upon Declarant and Complainant Lauren Brown, executed at Lancaster, County of Los Angeles, on December 15, 2005.  (**Exh 1** at bate stamp nos. 100, 103 (*emphasis added*).)   The Felony Complaint alleged a prior strike involving a 10/10/1998 conviction date in Federal Court.  (**Exh 1** at bate stamp no. 102.)

## J.   DEFENDANT BROWN SUBMITTED FOOT PRINT EVIDENCE TO THE CRIME LAB FOR PROCESSING AND NEVER TURNED IT OVER TO PLAINTIFF BEFORE THE MARCH 9, 2006 PRELIMINARY HEARING OR MARCH 2007 TRIAL

132.   The crime scene investigator arrived at the robbery scene on December 14, 2005 and took photographs of shoe prints left behind by the robbers next to rulers.  The crime scene investigator obtained measurements of the shoe prints that were left behind by the robbers.

133.   Plaintiff's shoes were seized as evidence during his arrest on December 15, 2005 so that it can be compared with the shoe prints that were left behind by the robbers.

134.   Defendant Brown's case file contained a hand-written note stating:  "12/15 – ctd crime lab Rebecca Carr placed order for veh & evid process to include prints – shoe prints & red dye."  (**Exh 2** at bate stamp no. 269 (*emphasis added*).)

135.   Defendant Brown's case file contained a hand-written note stating:   "ctd crime lab (800) 974-4522, Rebecca Carr.  Ordered Latent prints, red dye processing of 05 Dodge and contents. Ordered processing of evidence at Lennox Station.  Red dye and lp ev: 2 and ev: 10. Red Dye for ev: 3, 4, 5, 8 & 9. ***Sole pattern of ev: 8 & 9***."  (**Exh 2** at bate stamp no. 266 (*emphasis added*).)

136.   The photos of the foot prints show that the foot prints from the robbery scene were measured by a ruler and the sole pattern can be seen.  (**Exh 13**.)

137.   A comparison of the sole patterns from the foot prints in the photos from the robbery scene, (**Exh 13**), do not match the sole patterns of the shoes seized during Plaintiff's arrest on December 14, 2005, (**Exh 2** at bate stamp nos. 306-307; **Exh 9** at 14-15, 18-19; **Exh 14**.)

138.   Defendants were in possession of the crime lab analyses of Plaintiff's shoes and the shoe prints and sole pattern left behind by the robbers but they never turned it over to Plaintiff before the March 9, 2006 Preliminary Hearing or the March 2007 trial.

## K.   DEFENDANT BROWN WAS IN POSSESSION OF (1) CLAUDIA RISSLING'S FBI WITNESS STATEMENT AND (2) CELL PHONE RECORDS PRIOR TO THE MARCH 9, 2006 PRELIMINARY HEARING AND MARCH 2007 TRIAL BUT NEVER TURNED IT OVER TO DEFENDANTS

139.   Defendant Brown and the FBI jointly investigated the bank robbery. Defendant Brown was in possession of an FBI witness statement from Claudia Rissling. Defendant Brown's case file contained the following FBI witness statement from Claudia Rissling:  Robber #1 jumped over the teller counter at the second teller station and stated, 'Get the fuck down.'  Robber #1 then removed money from her drawer and put it in a bag.  Robber #1 is(1) sex:  male; (2) race:  black (***medium complexion***); (3) height:  5'9" to 5'10"; (4) weight:  medium build, 170 to 180 lbs; (5)  age 20 – 25 years; (6) clothing: wearing a nylon black mask over face; hat or hood; all baggy dark clothing; dark blue jacket/nylon hip length; dark grey Dickie type pants; blue Converse type shoes; gloves unknown.  (**Exh 2** at bate stamp nos. 167-168 (*emphasis added*).)

140.   Defendants did not turn over to Plaintiff the FBI witness statement of Claudia Rissling (wherein she described the robber who was next to her, jumped her counter, and wearing Converse shoes as black ***medium complexion***) prior to the March 9, 2006 Preliminary Hearing and the March 2007 trial.

141.    The FBI witness statement is exculpatory because it impeaches Claudia Rissling's in-court identification of Plaintiff as being one of the robbers.  As set forth below, Claudia Rissling identified the robber who was next to her, jumped over her counter and wearing Converse shoes as a darker black skin male similar to Plaintiff.  Her statement to the FBI described the robber who was next to her, jumped over her counter and wearing Converse shoes as black medium complexion.

142.    Defendant Brown was in possession of cell phone records regarding three cell phones that were seized from Plaintiff and Darris Allen during their arrest on December 14, 2005.  Defendant Brown was in possession of the cell phone records prior to the March 9, 2006 Preliminary Hearing and March 2007 trial.

143.    FBI agent Nordstrom utilized Federal Grand Jury Subpoenas to obtain Verizon and Nextel subscriber and call detail records for cell founds found in Plaintiff's vehicle.  (**Exh 15** at 4 of 5.)  FBI agent Nordstrom utilized Federal Grand Jury subpoenas to obtain call record information from four cell phones, which the Sheriff's Department had recovered and believed to be related to the investigation.  (**Exh 7** at 6 ln. 12-20.)

144.    On February 21, 2006, United States District Judge R. Gary Klausner issued an Order Authorizing Disclosure of Grand Jury Materials, which authorized the United State of America to disclose copies of the records described in the United States of America's Ex Parte Application for Order Authorizing Disclosure of Grand Jury Material to, inter alia, Deputy District Attorney Fred Mesropi of the Los Angeles County District Attorney's Office and Detective L.R. Brown of the Los Angeles County Sheriff's Department relating to the armed bank robbery of Bank of America on December 14, 2005.  (**Exh 2** at bate stamp nos. 330-331.)

145.    Defendants did not turn over to Plaintiff the cell phone records prior to the March 9, 2006 Preliminary Hearing and March 2007 trial.

146.    Plaintiff is informed and believes, and based thereon alleges, that the cell phone records contain cell tower information showing that Plaintiff's cell phone was not at the location of the robbery when it took place.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

147.   Plaintiff is informed and believes, and based thereon alleges, that the cell phone records that were turned over to Plaintiff after his convictions were manipulated and doctored.  Specifically, all inbound and outbound calls from December 9, 2005 to December 13, 2005 on the cell phone records were deleted; and the cell tower information regarding Plaintiff's cell phone was deleted.

148.   The cell phone records were exculpatory because it will show that Plaintiff was not at the scene of the robbery when it took place.

## L.   THE MARCH 9, 2006 PRELIMINARY HEARING

149.   On December 29, 2005, the People informed Defendant Brown that a discovery hearing / pretrial was set for January 25, 2006 and asked Defendant Brown to bring copies of the entire case file, reports, notes, and photographs regarding People v. Tarkington.  (**Exh 2** at bate stamp no. 265.)

150.   The Preliminary Hearing was held on March 9, 2006. (See **Exh 3**, generally.)

151.   At the March 9, 2006 Preliminary Hearing, Plaintiff was wearing a dark blue jail jumpsuit and seated next to defense counsel.  (**Exh 3** at 86 ln. ln. 16-18.)

152.   At the Preliminary Hearing, Bank teller Claudia Rissling testified she worked at the Bank of America located at 4644 East Avenue S, Palmdale, CA on December 14, 2005 when three males came in and yelled "get the fuck down." (**Exh 3** at 25 ln. 4-27.)  Over defense counsel's objection and while Plaintiff was sitting in court next to his attorney, handcuffed, and wearing prison garb at the Preliminary Hearing, the Court permitted Claudia Rissling to make an in-court identification of Plaintiff as one of the robbers who came to her station, jumped over her counter, was wearing Converse shoes, and had darker black skin.

153.   Defendants were in possession of cell phone records, the photographs of shoe prints lifted from the robbery scene, the crime lab analyses of the shoe prints lifted from the robbery scene and Plaintiff's shoes, and the FBI witness statement of Claudia

Rissling before the March 9, 2006 Preliminary Hearing and 2007 trial but did not produce it.

## M.   LACK OF FORENSIC EVIDENCE PHYSICALLY LINKING PLAINTIFF TO THE SCENE OF THE ROBBERY

154.   The Los Angeles County Sheriff's Department Scientific Services Bureau tested the DNA on the black pantyhose believed to be used as a mask to cover the face. The partial DNA profile obtained from the pantyhose is a mixture consistent with two sources of DNA; and both Darris Allen and LaMont Tarkington were excluded as possible contributors to the mixture. (**Exh 16**, October 6, 2006 DNA Laboratory Report.)

155.   Latent fingerprints were lifted off the 2005 Ford Explorer believed to be used as the getaway vehicle.  The Los Angeles County Sheriff's Department Scientific Services Bureau Latent Prints Section – Comparison Unit confirmed that Plaintiff's fingerprints did not match the latent prints lifted off the 2005 Ford Explorer.  (**Exh 17**, January 19, 2006 Latent Print Examination Report.)

## N.   THE TRIAL AND CONVICTION BASED ON FABRICATED AND SUPPRESSED EVIDENCE

156.   Defendants were in possession of cell phone records, the photographs of shoe prints lifted from the robbery scene, the crime lab analyses of the shoe prints lifted from the robbery scene and Plaintiff's shoes, and the FBI witness statement of Claudia Rissling prior to the March 2007 trial but did not produce it.

157.   At the trial in March 2007, Claudia Rissling testified the robber in the lobby was a light skinned black male and the robber next to her was a dark-skinned black male. (**Exh 4** at 422 ln. 20-25.)  Claudia Rissling testified that the robber that jumped over the counter and was next to her had Converse shoes, gray dickey pants.  (**Exh 4** at 447 ln. 13-28; 448 ln. 1-5.)  Claudia Rissling testified that she can see the skin from the neck and from the eyes.  (**Exh 4** at 479 ln. 10-13.)  Claudia Rissling identified Plaintiff as the

robber that was next to her and was the ***darker-skinned*** black male.  (**Exh 4** at 424 ln. 2-20 (*emphasis added*).)  Claudia Rissling testified that the skin color of the robber matches that of [Plaintiff and Darris Allen] who were sitting in front of her.  (**Exh 4** at 438 ln. 9-11.)  Rissling testified that the skin tome differences in African Americans are more obvious, that she is looking at [Plaintiff and Darris Allen], and that one's light-skinned and one's dark-skinned.  (**Exh 4** at 480 ln. 1-7.)  While Plaintiff was standing, Rissling testified the person who came over the counter, was next to her, and had a similar skin tone and height was Plaintiff. (**Exh 4** at 482 ln. 10-19.)

158.   During closing argument, the prosecution argued Plaintiff had the same skin tone as the guy that went over the counter.  (**Exh 6** at 1631 ln. 20-25.)  During the trial, Claudia Rissling was the only bank teller who testified that the skin tone of one of the robbers matched Plaintiff.

159.   During closing argument, the prosecution argued to the jury that Plaintiff was caught in the car with a shirt that had dye on it, which connected him to the robbery.  (**Exh 6** at 1622 ln. 27-28; 1623 ln. 1.)  The prosecution further argued to the jury that the towel was found in the back seat of Plaintiff's car, it belonged to Plaintiff, and it was related to the robbery.  (**Exh 6** at 1624 ln. 11-22; 1643 ln. 4-6.)

160.   During closing argument, the prosecution argued to the jury that Plaintiff was caught in the car with a shirt that had dye on it, which connected him to the robbery.  (**Exh 6** at 1622 ln. 27-28; 1623 ln. 1.)  The prosecution further argued to the jury that the towel was found in the back seat of Plaintiff's car, it belonged to Plaintiff, and it was related to the robbery.  (**Exh 6** at 1624 ln. 11-22; 1643 ln. 4-6.)

161.   At trial, the prosecution introduced People's 74 a photograph of the back seat of the Dodge [Magnum] showing a bag of coins.  (**Exh 6** at 1429 ln. 28; 1430 ln. 1-18; **Exh 11**, People's 74.)

162.   At trial, the prosecution introduced People's 57 a photograph of coins in baggie [allegedly] found in the rear seat [of the Dodge Magnum].  (**Exh 4** at 754 ln. 7-15.)

**FIRST AMENDED COMPLAINT FOR DAMAGES**

34

163.   On March 26, 2007 during readback, alternate juror number 3 stated that the three alternates did discuss the case and evidence.  (**Exh 6** at 1767 ln. 3-17, 1774 ln. 12-20.)  Alternate juror number 3 stated that he/she discussed with the other two alternate jurors, "Well, I did say – and it was a bit much of a concern.  It was something that – the tank top as having pepper spray.  That was one of the question I had."  (**Exh 6** at 1775 ln. 13-24.)  Alternate juror number 3 stated other than saying something about the tank top having pepper spray, he recalled stating, "I did say that because that was one of the things I didn't know, whether it picked up the tank top when he checked it for pepper spray or whether it was the towel."  (**Exh 6** at 1776 ln. 8-14.)

164.   On March 26, 2007 during readback, alternate juror number 2 stated that he/she discussed the evidence in the case.  (**Exh 6** at 1767 ln. 3-17, 1777 ln. 22-27.)  Alternate juror number 2 stated that she/he discussed wanting to see the evidence, "in reference to the t-shirt versus the towel and money and the change."  (**Exh 6** at 1778 ln. 1-7.)  Alternate juror number 2 stated that he/she said, "if we could be there that we would want to see the evidence…"  (**Exh 6** at 1778 ln. 23-25.)  Alternate juror number 3 talked about specifically wanting to see the t-shirt and towel.  (**Exh 6** at 1778 ln. 26-28; 1779 ln. 1-2.)

165.   On March 27, 2007, a jury convicted Plaintiff of five counts of second-degree robbery, Penal Code sec. 211, one count of second-degree commercial burglary, Penal Code sec. 459, that Plaintiff robbed the bank for the benefit of a criminal street gang, Penal Code sec. 186.22(b)(1), and that a principal used a firearm in the commission of that crime, Penal Code sec. 12022.53(b)(e)(1).  (**Exh 6** at 1789 – 1800.)  The Judge sentenced Plaintiff to 39-years and 4-months in state prison.  (**Exh 6** at 1874 – 1876.)

## O.   POST-TRIAL APPEAL

166.   On June 15, 2007, Plaintiff appealed his convictions.  The Court of Appeals affirmed the convictions but struck Plaintiff's 10-year enhancement for gun use and gang enhancement because there was insufficient evidence to support the findings that Plaintiff

robbed the bank for the benefit of a gang.  (**Exh 18**, *People v. Tarkington*, Court of Appeal Second Appellate District Division One, B199860, 12/9/2008, at 15.)

167.   In upholding Plaintiff's conviction, the Court of Appeals held that the evidence against Plaintiff, although circumstantial, was very strong.  (**Exh 18**, *People v. Tarkington*, Court of Appeal Second Appellate District Division One, B199860, 12/9/2008, at 7.)  ***The strong circumstantial evidence cited by the Court of Appeals to uphold Plaintiff's convictions included (1) one of the tellers stated Plaintiff had the same or similar skin color, height and build as two of the robbers and (2) there was the presence of an unexplained bag of coins covered with red dye in Plaintiff's car***.  (**Exh 18**, *People v. LaMont T. Tarkington*, Court of Appeal Second Appellate District Division One, B199860, 12/9/2008, at 7 (*emphasis added*).)

## P.   FREEDOM OF INFORMATION ACT

168.   After his conviction in March 2007, Plaintiff submitted a Freedom of Information Act and discovered that the FBI had participated in the investigation and/or prosecution of the robbery occurring on December 14, 2005.  The FBI case file/reports contain a witness statement by bank teller Claudia Rissling describing the physical attributes of the robbery suspects not matching Plaintiff.

169.   Prior to his conviction in March 2007 and the March 9, 2006 Preliminary Hearing, Defendants did not produce to Plaintiff a copy of Claudia Rissling's FBI witness statement wherein she described the robber who came to her counter and was next to her as having "***medium complexion***" nor the identity of impeachment witness FBI agent Sonja Nordstrom who took down Claudia Rissling's witness statement.

///

///

///

**Q.   THE COURT OF APPEALS REVERSED PLAINTIFF'S CONVICTION DUE TO DEFENSE COUNSEL'S FAILURE TO TEST THE TOWEL AND T-SHIRT FOR BANK DYE**

170.   On October 14, 2011, Plaintiff filed a petition for writ of habeas corpus contending, inter alia, that he was deprived of inadequate assistance of counsel because trial counsel failed to obtain certain cell phone information to support testimony of a defense witness that he was in a different location when the robberies were committed and failed to test certain items found in Plaintiff's vehicle that did not contain red dye from the banks' dye pack, which was cited by the prosecution.  (**Exh 19**, *In re Lamont T. Tarkington on habeas corpus*, Court of Appeal Second Appellate District Division One, 11/6/2017, B270141, at 34-36)

171.   During writ of habeas corpus proceedings, Plaintiff testified that he kept a sleeveless white shirt and towel in the rear cargo area of his vehicle to clean the chrome on his rim; and that the items had red coloring because a week prior to being arrested, he had spilled vodka and ruby red cranberry juice and used the shirt and towel to clean up the spill.  (**Exh 20** at 53 ln. 1-28; 54 ln. 6-28; 55 ln. 17-28; 56 ln. 1; 57 ln. 7-18.)

172.   During an evidentiary hearing on writ of habeas corpus, Joseph J. Cavaleri, Senior Criminalist, from the Los Angeles County Sheriff's Department Scientific Services Bureau tested the towel and t-shirt, and issued a report confirming that there was no bank dye on the towel and t-shirt.  (**Exh 21,** April 14, 2014 laboratory examination report by Joseph Cavaleri.)

173.   During an evidentiary hearing on writ of habeas corpus, Criminologist Peter D. Barnett tested the towel and t-shirt, and issued a report confirming there was no bank dye on the towel and t-shirt.  (**Exh 22,** October 9, 2013 supplemental report by Peter Barnett.)

174.   Peter Barnett testified that he is confident the test he used is sufficient to distinguish whether the red stains on the [towel and t-shirt] is MAAQ unless the bank dye has properties that are different from MAAQ.  (**Exh 8** at 327 ln. 3-10.) Peter Barnett

testified that the red stain on the shirt is more consistent with a liquid other than some kind of solid.  (**Exh 8** at 333 ln. 7-19.)

175.   On May 28, 2015, the People stipulated that there was no bank dye on the towel and t-shirt recovered at the crime scene.  (**Exh 23**, Transcript 5/18/2015 at 6 ln. 5-14.)

176.   In reversing the Plaintiff's conviction on writ of habeas corpus, the Court of Appeals held:

> "the only item found on Tarkington that tied him to the robbery was the $200 in cash, which Allen said he gave to Tarkington as payment for the ride. ***The shirt and towel found in the back of the vehicle were thus used by the prosecution to help directly connect Tarkington to the robbery…   Thus, the shirt and towel were not merely cumulative pieces of evidence that tied Tarkington to the robbery without a viable explanation as to how they came into his possession; they were the only items to do so***….   Indeed, the case against Tarkington has been reduced to the false name he gave to law enforcement when pulled over— unsurprising given he was still on federal supervised release—and the alleged similarities between Tarkington's height, build, and skin color to one of the robbers.  Even if we apply the trial court's incorrect sufficiency of the evidence standard of review, ***the case against Tarkington is simply not strong enough to uphold***."

(**Exh 19**, *In re Lamont T. Tarkington on habeas corpus*, Court of Appeal Second Appellate District Division One, 11/6/2017, B270141, at 34-36 (*emphasis added*).)

177.   After the Court of Appeal granted the petition for writ of habeas corpus and reversed Plaintiff's convictions, it instructed the People to either release Plaintiff from custody or retry him.  (**Exh 19**, *In re Lamont T. Tarkington on habeas corpus*, Court of Appeal Second Appellate District Division One, 11/6/2017, B270141, at 38.)

178.   On January 31, 2018, the California Supreme Court denied the Petition for Review seeking to challenge the Court of Appeals' reversal of Plaintiff's convictions. (**Exh 24**, Docket Sheet California Supreme Court case no. S245667.)

**FIRST AMENDED COMPLAINT FOR DAMAGES**

179.   On March 16, 2018, the People elected to retry Plaintiff and filed an Amended Information charging Plaintiff with five counts of robbery and one count of burglary.  (**Exh 25,** Amended Information.)

## R.   THE FILING OF THE CRIMINAL COMPLAINT ON DECEMBER 15, 2005 AT 3:07 P.M., THE JUDGE'S FINDING OF PROBABLE CAUSE AT THE PRELIMINARY HEARING ON MARCH 9, 2006, PLAINTIFF'S CONVICTION IN MARCH 2007, AND THE RETRIAL IN 2018 WERE ALL BASED ON FABRICATED AND/OR SUPPRESSED EVIDENCE

180.   The People's filing of the Felony Complaint on December 15, 2005 at 3:07 PM, the Judge's finding of probable cause on March 9, 2006, Plaintiff's conviction in March 2007, and the People's decision to re-try Plaintiff in 2018 were all predicated on fabricated evidence, fraud, and suppressed evidence created by Defendants Sergeant Young, Murren and Brown.

181.   Although the Court of Appeals granted Plaintiff's writ of habeas corpus and reverse his convictions on defense counsel's ineffective assistance of counsel, it was premised entirely on fabricated evidence and fraud created by Defendants Sergeant Young, Murren and Brown.  If defense counsel had tested the towel and t-shirt for bank dye, it would have exposed Defendants Sergeant Young, Murren and Brown's misconduct in falsifying evidence and the existence of bank dye and pepper spray on the towel and t-shirt as well as their planting of the clear bag containing a black stocking and coins covered in red dye in the back seat of Plaintiff's car.  Indeed, the Court of Appeals even invoked the exception to the procedural bar to successive writs by holding that it would be a "***miscarriage of justice***" to hold otherwise "***given the paucity of evidence in Tarkington's criminal case***..."  (**Exh 19**, *In re Lamont T. Tarkington on habeas corpus*, Court of Appeal Second Appellate District Division One, 11/6/2017, B270141, at 37 (*emphasis added*).)

182.   Defendants Sergeant Young, Murren and Brown's misconduct and fraud were exposed by the arresting deputies, Wheeler, DiGiovanni and Diane Garcia Moreno, initial field search.   Deputies Wheeler, DiGiovanni and Diane Garcia Moreno's initial field search of the Dodge Magnum for evidence from a bank robbery is more trustworthy and reliable than that of the Defendants.   Deputy Diane Garcia Moreno's regular partner was out that night and she was partnered up with non-regular partners Deputies Wheeler and DiGiovanni.   When the arresting deputies conducted a field search of Plaintiff's Dodge Magnum on December 14, 2005, they were informed by an FBI agent that the large sum of currency smelling of bleach and stained with red dye recovered from Darris Allen may have been from a robbery that took place earlier that day in Palmdale, CA. The arresting deputies conducted a thorough search of the Dodge Magnum for evidence from a robbery, including red dye-stained items.   They did not find a clear plastic bag containing a black stocking and coins covered with red dye in the rear seat of the car. Furthermore, the arresting deputies did not smell pepper spray on the currency, towel, t-shirt or inside the Dodge Magnum.   Lastly, the arresting deputies did not book into evidence any towel, t-shirt, or clear plastic bag containing a black stocking and coins covered in red dye.

183.   Defendants Sergeant Young, Murren and Brown misconduct and fraud included their booking into evidence the towel and t-shirt found in the rear hatch/trunk area of Plaintiff's car, which they falsely presented as being stained with red dye and contaminated with pepper spray.   They took misleading photos of the towel and t-shirt to give the impression that these articles of clothing were stained with red dye from an exploded bank dye pack.   They planted the clear plastic bag containing a black stocking and coins covered with red dye in the rear seat of Plaintiff's car.   They took misleading photos of these items being in the back seat to further frame Plaintiff.   They falsified police reports of the impound search by noting that the towel, t-shirt, clear plastic bag, and coins were evidence from the robbery and found in Plaintiff's car.   They omitted from police reports that the interior of the Dodge Magnum, towel and t-shirt did not smell

of pepper spray.   To further cover up their fraud and misconduct, Defendants Sergeant Young, Murren and Brown asserted that the impound search of the Dodge Magnum took place eight days after the robbery on December 22, 2005; yet, their own police report and the Field Investigation Log by Crime Scene Investigator Alex Strouzer document the search of the Dodge Magnum took place on December 15, 2005.   To further frame Plaintiff, Defendants suppressed the shoe print evidence and crime lab analyses of it showing that the sole patterns and size of the shoe prints from the scene do not match Plaintiff's shoes, which Defendants were in possession of prior to the March 9, 2016 Preliminary Hearing and the 2007 conviction.

184.   To further frame Plaintiff, Defendants suppressed the FBI witness statement of Claudia Rissling and impeachment witness FBI agent Sonja Nordstrom, which Defendants were in possession of prior to the March 9, 2016 Preliminary Hearing and the 2007 conviction.

185.   Defendants Sergeant Young, Murren and Brown misled the People and Judge from the outset.   The People relied on false and suppressed evidence by Defendants Sergeant Young, Murren and/or Brown to file the Felony Complaint against Plaintiff on December 15, 2005 at 3:07 PM at the Los Angeles Superior Court.   The People relied on Defendants Sergeant Young, Murren and Brown's false statements and observations during their impound search of the Dodge Magnum on December 15, 2005, their finding the towel, t-shirt, clear plastic bag with black stocking and coins covered with red dye in Plaintiff's car, their suppression of the foot print evidence and crime lab analyses, their taking misleading photos of the towel, t-shirt, clear plastic bag with black stocking and coins covered with red dye in the back seat of Plaintiff's car, and their falsifying official reports of the impound search.   If the People were aware of the aforementioned fraud and misconduct of Defendants Sergeant Young, Murren and Brown, it would not have prosecuted Plaintiff for felony robbery and burglary leading to Plaintiff's conviction in March 2007.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

41

186.   If the judge was aware of the aforementioned fraud and misconduct of Defendants Sergeant Young, Murren and Brown, she would not have found probable cause and hold Plaintiff over to answer the Felony Complaint on March 9, 2006.

187.   In 2012, Defendant Brown told Deputy District Attorney Rhonda Saunders that the getaway car smelled of pepper spray from the bank dye packs, that he recovered a bag of coins with red dye and black pantyhose from Plaintiff's car, and that the towel and t-shirt was stained and smelled of pepper spray from the dye pack.  (**Exh 26**.)  When Deputy District Attorney Shannon Sexton announced it was retrying Plaintiff in 2018, she was in possession of the statements Defendant Brown gave to Deputy District Attorney Rhonda Saunders in 2012.

188.   On May 14, 2018, Deputy District Attorney Shannon Sexton listed Defendants Murren and Murren on her witness list because they, "searched the defendant's car after it had been impounded."  (**Exh 27**.)  Since Defendants Murren and Brown fabricated and suppressed evidence from his search of the Dodge Magnum, Deputy District Attorney Shannon Sexton was relying on the same fabricated and suppressed evidence obtained from Defendants Murren and Brown to prosecute Plaintiff during the 2018 retrial.  In spite of Defendants Murren and Brown obstructing justice, Defendant County allowed them to be used as prosecution witnesses.

189.   On May 30, 2018, Defendant Brown told the District Attorney Shannon Sexton (who was prosecuting Plaintiff on retrial) that "***I would hate to see a second time bank robber get off***."  (**Exh 28** (*emphasis added*).)

190.   The People's decision to retry Plaintiff in 2018 was based the false evidence seized by Defendants Sergeant Young, Murren and Brown during the impound search on December 15, 2005 as well as their statements to Rhonda Saunders in 2012.  Indeed, during the retrial in 2018, the People stated to Judge Tavelman, "I also off the record informed the court of my witnesses [Defendant Brown] which I believe are ***extremely necessary to the prosecution of this case*** and their unavailability as such I'm announcing unable to proceed."  (**Exh 29** at 2 ln. 8-11 (*emphasis added*).)  When Judge Tavelman

stated, "Right. That's my understanding that Detective Brown despite knowing about the case is out of state and is either unable or unwilling to return in a timely manner for trial?", the People answered, "Yes." (**Exh 29** at 3 ln. 1-5.)  The People listed Defendants Murren and Brown on its list of witnesses for the trial and stated that Defendants Murren and Brown will be testifying about the search of the Dodge Magnum. (**Exh 27**.)  Since the People stated that Defendant Brown was "***extremely necessary to the prosecution***" and listed Defendants Murren and Brown as witnesses for the retrial, the People were still relying on the evidence that Defendants Murren and Brown observed, seized, fabricated, planted, seized and/or suppressed during the impound search on December 15, 2005 to prosecute Plaintiff in 2018.

191.   Defendants continued to misrepresent the evidence it seized and/or suppressed to induce the District Attorney Shannon Sexton to retry Plaintiff in 2018, which was done not to bring Plaintiff justice but was instead was brought for the ulterior purpose of extorting Plaintiff to accept a plea deal so as to shield Defendants from this civil action for constitutional violations.

192.   Defendants have engaged in borderline frivolous arguments and positions to cover up the fraud and misconduct of Defendants Sergeant Young, Murren and Brown. Two forensic experts confirmed that there is no bank dye on the towel and t-shirt. None of the arresting deputies, Wheeler, DiGiovanni, or Diane Garcia Moreno, on the night of December 15, 2005 smelled pepper spray on the currency, coins, or interior of the Dodge Magnum.  The arresting deputies, Wheeler, DiGiovanni, and Diane Garcia Moreno, noted smelling bleach from the currency and that it was moist.  The People even stipulated that there was no red bank dye on the towel and t-shirt.  Defendants argue that bleach can wash off all residue of red bank dye while leaving the red coloring on the towel and t-shirt while leaving intact the strong scent of pepper spray.  This "wash theory" is illusory, defies logic, and thus constitutes a borderline frivolous argument that is brought to further cover up Defendants Sergeant Young, Murren and Brown's misconduct, fraud and deceit. There is no evidence to show that the bank dye packs in question contained any pepper

spray contaminate and it is nothing more than another falsehood created by Defendants. The exploded bank dye packs are in Defendants possession, and there is no forensic evidence to show that the type and model of exploded bank dye packs used by the victim bank contained pepper spray contaminate.

193.   Defendants Sergeant Young, Murren and/or Brown planted the clear plastic bag containing a black stocking and coins covered with red dye in the rear seat of Plaintiff's Dodge Magnum during the impound search on December 15, 2005.

## S.   PARTICIPATION, STATE OF MIND, AND DAMAGES

194.   All Defendants acted without the authorization of law.

195.   Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them.  Each Defendant ratified, approved and acquiesced in the violations alleged herein.

196.   As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

197.   Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiff's rights.

198.   Each Defendant acted with deliberate indifference to or reckless disregard for an accused's rights for the truth in withholding evidence from prosecutors and fabricating evidence to prosecutors, for an investigation free of active concealment of material facts, and/or for Plaintiff's right to due process of law.

199.   As a direct and proximate results of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff has suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

200.   Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury.   For such injury, Plaintiff will incur significant damages based on psychological and medical care.

201.   As a further result of the conduct of each of these Defendants, Plaintiff has lost past and future earnings in an amount to be determined according to proof at trial.

202.   As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to raise a family.

203.   The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of Plaintiff, entitling Plaintiff to exemplary and punitive damages from the individual defendants, other than the County, in an amount to be proven at the trial of this matter.

204.   By reason of the above-described acts and omissions of Defendants, Plaintiff was required to retain an attorney to defend against the criminal charges and institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988 and California Civ. Code §52.1 plus a multiplier of four (4).

## **FIRST CLAIM FOR RELIEF**
### **DEPRIVATION OF CIVIL RIGHTS**
### **42 U.S.C. § 1983, FABRICATION OF EVIDENCE**
### **(Against Defendants Sergeant Young, Murren and Brown)**

205.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

206.   Defendants Brown, Murren, Sergeant Young, and Does 1-10, while acting under color of law, deprived Plaintiff of his civil rights, more particularly, his right to due process of law, by providing false evidence in reports, improperly influencing witnesses and fabricating and concealing evidence, that resulted in depriving Plaintiff liberty because they set in motion a reasonably foreseeable chain of events that led to the presentation of false evidence at Plaintiff's 2007 criminal trial, his conviction and incarceration for at least twelve years in jail and prison.

207.   Each defendant knew or should have known the evidence was false, and each defendant's conduct was done with deliberate indifference to and/or reckless disregard of Plaintiff's rights or for the truth.

208.   Each defendant deliberately fabricated bank dye and pepper spray on the towel and t-shirt found in the back of Plaintiff's car, took misleading photos of the towel and t-shirt having red bank dye, planted and took misleading photos of the clear bag containing the black stocking and coins covered with red dye in the back seat of Plaintiff's car, wrote false police reports regarding finding bank robbery evidence during the  impound search of Plaintiff's car, and used investigation techniques in a manner so abusive that they knew or should have known that they would, and are known to, yield false evidence.  Defendants Brown, Murren, Sergeant Young, and Does 1-10 concealed and fabricated evidence that led to a false and wrongful conviction.

209.   Defendants Brown, Murren, Sergeant Young, and Does 1-10 knew or should have known that evidence set forth above was false, and that the witnesses were providing false evidence.

210.   The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein.  Plaintiff brings this claim as both a procedural and a substantive due process violation.  To the extent that any court was to conclude that the source of Plaintiff's right to be free from concealed and fabricated evidence that led to a false and wrongful conviction, is any constitutional source other

than due process (such as the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is brought on those bases as well.

211.   Where fabrication of evidence has a meaningful connection to a prosecution, conviction and incarceration, an independent cause of action exists under § 1983 for deprivation of substantive due process under the Fourteenth Amendment, despite the existence of probable cause. *Halsey v. Pfeiffer*, 750 F.3d 273, 292-93 (3rd Cir. 2014); see also *Spencer v. Peters*, 857 F.3d 789, 801 (9th Cir. 2017) (rejecting the contention that a plaintiff must "prove that, setting aside the fabricated evidence, probable cause was lacking").

212.   To state a claim for fabrication of evidence, Plaintiff must show "(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (citations omitted).

213.   Defendants Brown, Murren, Sergeant Young, and Does 1-10 were each jointly and severally responsible to not use false evidence against Plaintiff.  Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

214.   As a result of the defendants', and each of their, violations of Plaintiff's constitutional right to not have false evidence turned over to the prosecutors handling this case and ultimately to the defense, Plaintiff was damaged as alleged above.

215.   Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees to defend against the criminal charges and prosecute this action, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

216.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

217.   The individual Defendants named herein acted with a conscious disregard of Plaintiff's rights, conferred upon him by Section 1983, Title 42 of the United States Code, the Fourth and Fourteenth Amendments to the United States Constitution and California Civil Code Section 3333, by virtue of ensuring Plaintiff was arrested, subject to improper police investigation, and subject to prosecution for crimes he did not commit. Defendants had an interest in seeing to it that Plaintiff was prosecuted for crimes he did not commit for purposes of punishing and harming Plaintiff and for purposes of asserting that the Sheriff's Department had apprehended the robbery suspect.   Such conduct constitutes malice, oppression and/or fraud under 42 U.S.C. § 1983 and California Civil Code Section 3294, entitling Plaintiff to punitive damages against the individual Defendants in an amount suitable to punish and set an example of.

## SECOND CLAIM FOR RELIEF
### JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS
### 42 U.S.C. § 1983, FABRICATION OF EVIDENCE
### (Against Defendants Sergeant Young, Murren and Brown)

218.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

219.   Defendants Brown, Murren, Sergeant Young, and Does 1-10, were jointly and severally responsible as investigators assigned to the Tarkington case to share material information with each other, and to ensure that any evidence was not fabricated.

220.   Defendants Brown, Murren, Sergeant Young, and Does 1-10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to not have false evidence used in the underlying criminal case, as elaborated above.  The use of false evidence, as well as other actions related to the use of such evidence, constitutes an overt act in furtherance of said conspiracy.

221.   Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

222.   As a result of Defendants', and each of their, violations of Plaintiff's constitutional rights to not have false evidence used against him, Plaintiff was damaged as alleged above.

223.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

224.   Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees to defend against the criminal charges and prosecute this action, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

225.   The individual Defendants named herein acted with a conscious disregard of Plaintiff's rights, conferred upon him by Section 1983, Title 42 of the United States Code, the Fourth and Fourteenth Amendments to the United States Constitution and California Civil Code Section 3333, by virtue of ensuring Plaintiff was arrested, subject to improper police investigation, and subject to prosecution for crimes he did not commit. Defendants, and each of them, had an interest in seeing to it that Plaintiff was prosecuted for crimes he did not commit for purposes of punishing and harming Plaintiff and for purposes of asserting that the Sheriff's Department had caught the suspect of a robbery. Such conduct constitutes malice, oppression and/or fraud under California Civil Code Section 3294, entitling Plaintiff to punitive damages against the individual Defendants in an amount suitable to punish and set an example of.

///

///

///

**THIRD CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS**

**42 U.S.C. § 1983, SUPERVISORIAL LIABILITY**

**(Against Defendants Sergeant Young, County of Los Angeles, and Does 1-10)**

226.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

227.   During the course and scope of the Tarkington investigation, Defendants Murren and Brown were supervised by Defendant Sergeant Young.  Defendant Sergeant Young was an experienced Sergeant, and he was obligated to ensure that Defendants Brown and Murren performed their duties as detectives, which would also include ensuring that Plaintiff's constitutional right to be free from being subjected to criminal prosecution due to false and suppressed evidence.

228.   On December 15, 2005, Defendant Sergeant Young was Defendants Murren and Brown's supervisor responsible for training and supervising them on the Tarkington case.  Defendant Sergeant Young went to the tow-yard to supervise and watch over Defendants Murren and Brown's search of the Dodge Magnum.  Defendant Sergeant Young was present at the tow-yard to observe Defendant Brown plant the clear plastic bag containing a black stocking and coins covered with the red dye in the rear seat of Plaintiff's car.  Defendant Sergeant Young knew or should have known that the towel and t-shirt did not have red bank dye or smell of pepper spray.  Yet, Defendant Sergeant Young supervised and watch Defendants Murren and/or Brown seize the towel and t-shirt as evidence of a bank robbery.  Defendant Sergeant Young supervised and watched Defendants Murren and/or Brown take and/or cause to be taken misleading photographs of the towel and t-shirt to give the false appearance of red bank dye being found on Plaintiff's clothing in the rear trunk area.  Defendant Sergeant Young supervised and watched Defendants Murren and/or Brown take and/or cause to be taken misleading photographs of the clear plastic bag containing a black stocking and coins covered with

the red dye being in the rear seat of Plaintiff's car.  The official reports show the search of the Dodge Magnum on December 15, 2005. Yet, Defendants Murren and Brown misrepresented to the People that the impound search took place on December 22, 2005. Defendant Sergeant Young knew or should have known that Defendants Murren and Brown's had misrepresented the date of the impound search to the People but ratified it by also misrepresenting to the People that the impound search took place on December 22, 2005.  Defendant Sergeant Young knew or should have known of Defendants Murren and Brown's misconduct during the impound search of the Dodge Magnum on December 15, 2005.  Yet, Defendant Sergeant Young took no corrective action against Defendants Murren and Brown but instead ratified their conduct by approving Defendant Sergeant Young's supplemental report dated December 30, 2005, which he knew or should have known contained an incomplete and/or misleading description of the impound search on December 15, 2005.  Defendant Young's ratification of Defendants Murren and Brown's falsifying and suppressing evidence constituted a custom of allowing rogue officers to obstruct justice and established a pattern and practice of violating Plaintiff's rights under the 4th and 14th Amendment of the Constitution to be free from criminal prosecution based on false evidence and suppressed evidence, unlawful incarceration, denial of liberty and denial of due process.  Defendant Young has not been disciplined for his ratification and participation regarding Defendants Murren and Brown's falsifying and suppression of evidence.

229.  Defendant Sergeant Young took no steps to intervene and/or stop Defendants Murren and Brown from fabricating evidence during their search of the Dodge Magnum on December 15, 2005.  Defendant Sergeant Young took no steps to intervene and/or stop Defendants Murren and Brown from suppressing exculpatory evidence during their investigation of the robbery, such as omitting exculpatory facts from official reports (e.g. there was no smell of pepper spray in the interior of the Dodge Magnum, towel, t-shirt, or coins; the clear bag containing the black stocking and coins covered with red dye were not in the rear seat of Plaintiff's car; and the sole pattern and

size of Plaintiff's shoes do not match the photos of the shoe print lifted from the robbery scene); suppressing FBI witness statement of Claudia Rissling and rebuttal witness FBI agent Nordstrom; and suppressing photos of the shoe prints and crime lab analyses of the foot prints.

230.   Due to Defendant Sergeant Young's failure to train and supervise Defendant Murren Brown and his ratification of their misconduct, Plaintiff was subjected to criminal prosecution based on fabricated and suppressed evidence.

231.   During the entirety of the investigation, Defendant Sergeant Young was Defendants Brown and Murren's supervisor and trainer.  Upon information and belief, Defendant Sergeant Young and Doe supervisors within the Los Angeles County Sheriff's Department who were responsible for monitoring Defendants Brown and Murren's performance and conduct as detectives in this investigation, were on notice of his lack of experience and conduct as a robbery detective and failed to take adequate steps to correct it through training or supervision.

232.   Upon information and belief, Defendants Brown and Murren received minimal discipline, training, and supervision, which level was grossly insufficient to address the inept, inadequate and deceitful investigation and fabrication of evidence in the Tarkington case.

233.   The inept, inadequate, and deceitful investigation and fabrication of evidence was a highly predictable or plainly obvious consequence of the inadequate training and lack of meaningful control or supervision of Defendants Brown and Murren.

234.   Defendant Sergeant Young, and Doe supervisors 1-10, acting within the course and scope of their employment had a duty to assure the competence of their employee/agents, including Defendants Brown, Murren and Does 1-10, but breached their duty and were negligent in the performance of their duties by selecting, training, reviewing, supervising, failing to supervise, failing to control, evaluating the competency and retaining Defendants Brown and Murren.   This breach of the duty of careful selection, training, review, supervision, periodic evaluation of the competency, and

retention of such law enforcement officers and/or employees and/or agents created an unreasonable risk of harm to persons such as Plaintiff.

235.   Defendant Sergeant Young and Doe supervisors 1-10 knew or should have known that Defendants Brown and Murren were unfit and/or incompetent to investigate the robbery due to his lack of experience, unfitness and/or incompetence created a particular risk to others.   The negligence of Defendant Sergeant Young and Doe supervisors 1-10 in the supervision and training of Defendants Brown and Murren was a substantial factor in the harm caused to Plaintiff by Defendant Sergeant Young.

236.   Defendant Sergeant Young and Doe supervisors 1-10 breached their duty of care to observe, report, monitor and control the investigation by Defendants Brown and Murren and other employees/agents.

237.   As a direct and legal result of the aforesaid negligence, carelessness and unskillfulness of Defendant Sergeant Young and Doe supervisors 1-10, and each of them, and as a result of their breach of duty of care to Plaintiff, Plaintiff suffered the damages alleged herein.

238.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

239.   Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees to defend against the criminal charges and prosecute this action, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

///

///

///

## **FOURTH CLAIM FOR RELIEF**

## **DEPRIVATION OF CIVIL RIGHTS**

## **42 U.S.C. § 1983, MALICIOUS PROSECUTION**

**(Against Defendants County of Los Angeles, Sergeant Young, Murren and Brown)**

240.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

241.   The Fourth Amendment's protection against unreasonable seizures encompasses the right to be free from malicious prosecution, which is also prohibited by the Fourteenth Amendment's guarantee against the deprivation of liberty without due process of law.

242.   Defendants County, Sergeant Young, Murren, Brown, and Does 1-10, while acting under color of state law, violated Plaintiff's clearly established right under the Fourth and Fourteenth Amendments by unlawfully and maliciously causing a criminal prosecution to be instituted against him.

243.   A claim for malicious prosecution lies where Plaintiff can show "the prior action terminated in Plaintiff's favor, was brought without probable cause, was initiated by or at the direction of Defendants, was initiated with malice, and was initiated 'for the purpose of denying [Plaintiff] equal protection or another specific constitutional right.'" *Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044, 1048 (E.D. Cal. 2008) (quoting *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004)). "[A] decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes *prima facie*—but not conclusive—evidence of probable cause." *Awabdy*, 368 F.3d at 1067 (citations omitted). Plaintiff can rebut that *prima facie* finding of probable cause "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Id.*

244.   Defendants Sergeant Young, Murren and Brown fabricated bank dye and pepper spray on the towel and t-shirt found in the back of Plaintiff's car, took misleading

photos of the towel and t-shirt having red bank dye, planted and took misleading photos of the clear bag containing the black stocking and coins covered with red dye in the back of Plaintiff's car, wrote false police reports regarding the impound search of Plaintiff's car, and used investigation techniques in a manner so abusive that they knew or should have known that they would, and are known to, yield false evidence.

245. Defendants Sergeant Young, Murren and Brown misled the People and Judge from the outset.  The People relied on false and suppressed evidence by Defendants Sergeant Young, Murren and/or Brown to file the Felony Complaint against Plaintiff on December 15, 2005 at 3:07 PM at the Los Angeles Superior Court.  The People relied on Defendants Sergeant Young, Murren and Brown's false statements and observations during their impound search of the Dodge Magnum on December 15, 2005, their finding the towel, t-shirt, clear plastic bag with black stocking and coins covered with red dye in Plaintiff's car, their suppression of the foot print evidence and crime lab analyses, their taking misleading photos of the towel, t-shirt, clear plastic bag with black stocking and coins covered with red dye in the back seat of Plaintiff's car, and their falsifying official reports of the impound search.

246. To further frame Plaintiff, Defendants suppressed the shoe print evidence and crime lab analyses of it showing that the sole patterns and size of the shoe prints from the scene did not match Plaintiff's shoes, which Defendants were in possession of prior to the March 9, 2016 Preliminary Hearing and the 2007 conviction.

247. To further frame Plaintiff, Defendants suppressed the FBI witness statement of Claudia Rissling and impeachment witness FBI agent Sonja Nordstrom, which Defendants were in possession of prior to the March 9, 2016 Preliminary Hearing and the 2007 conviction.

248. If the People were aware of the aforementioned fraud and misconduct of Defendants Sergeant Young, Murren and Brown, it would not have prosecuted Plaintiff for felony robbery and burglary leading to Plaintiff's conviction in March 2007.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

249.   If the judge was aware of the aforementioned fraud and misconduct of Defendants Sergeant Young, Murren and Brown, she would not have found probable cause and hold Plaintiff over to answer the Felony Complaint on March 9, 2006.

250.   In 2012, Defendant Brown told Deputy District Attorney Rhonda Saunders that the getaway car smelled of pepper spray from the bank dye packs, that he recovered a bag of coins with red dye and black pantyhose from Plaintiff's car, and that the towel and t-shirt was stained and smelled of pepper spray from the dye pack.  (**Exh 26**.)  When Deputy District Attorney Shannon Sexton announced it was retrying Plaintiff in 2018, she was in possession of the statements Defendant Brown gave to Deputy District Attorney Rhonda Saunders in 2012.

251.   On May 30, 2018, Defendant Brown told the District Attorney Shannon Sexton (who was prosecuting Plaintiff on retrial) that "***I would hate to see a second time bank robber get off***."  (**Exh 28** (*emphasis added*).)

252.   The People's decision to retry Plaintiff in 2018 was also based on false statements and evidence seized by Defendants Sergeant Young, Murren and Brown during the impound search on December 15, 2005 as well as Defendant Brown's statements to Rhonda Saunders in 2012.

253.   During the retrial in 2018, Deputy District Attorney Shannon Sexton listed Defendants Murren and Brown on her witness list because they will be testifying about how they "searched the defendant's car after it had been impounded."  (**Exh 27**.)  Deputy District Attorney Shannon Sexton characterized Defendant Brown as "extremely necessary to the prosecution of this case."  Thus, Deputy District Attorney Shannon Sexton was relying on Defendants Murren and/or Brown's false statements, false observations, fabricated evidence, misleading photos, fabricated reports, and planted evidence during the impound search on December 15, 2005 to retry Plaintiff in 2018.  In spite of Defendants Murren and Brown obstructing justice, Defendant County allowed them to be used as prosecution witnesses who will testify to false evidence and obstruct justice.  A reasonable person in the Defendants' position would have known that the facts

and circumstances were insufficient to justify a reasonable belief that Plaintiff committed the robbery offense.

254.    Without the false evidence generated by Defendants Sergeant Young, Murren and Brown coupled with (1) the suppressed foot prints, (2) the FBI witness statement of Claudia Rissling and rebuttal witness FBI agent Sonja Saunders, and (3) the forensic testing showing that the towel and t-shirt were fabricated, there simply was no probable cause for the judge to hold Plaintiff over on March 9, 2006 nor was their evidence for the People to prosecute Plaintiff in 2005 and retry him in 2018.

255.    On June 4, 2018, the People dismissed all charges against Plaintiff after jeopardy had attached.  (**Exh 30**.)

256.    Defendants acted maliciously, with reckless disregard of the law and of the legal rights of Plaintiff in causing a criminal proceeding to begin and to continue for a purpose other than bringing Plaintiff to justice.

257.    The People's initial prosecution in 2007 and ongoing prosecution in 2018 of Plaintiff was based on Defendants Sergeant Young, Brown, and Murren's misconduct and they continued to mislead the People for the ulterior purpose of extorting Plaintiff to accept a plea deal so as to shield Defendants from this civil action.

258.    As a consequence, Plaintiff was subjected to deprivation of liberty during the initial trial and re-trial, humiliation, fear, pain and suffering by the illegal acts of Defendants and suffered injuries as a result of Defendants' actions.

259.    Plaintiff is entitled to compensatory damages, punitive damages, attorney's fees under 42 U.S.C. §1988 for defending against the criminal charges and prosecuting this action, and all applicable law in a sum to be proven at trial, and such additional relief as the Court deems just and proper.

///

///

///

### FIFTH CLAIM FOR RELIEF
### DEPRIVATION OF CIVIL RIGHTS
### 42 U.S.C. § 1983, *BRADY* VIOLATIONS

**(Against Defendants County of Los Angeles, Sergeant Young, Murren and Brown)**

260.  Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

261.  Defendants County, Sergeant Young, Murren, Brown, and Does 1 – 10, while acting under color of law, deprived Plaintiff of his civil rights by violating his right to have material, exculpatory and impeachment information as required by *Brady* turned over to Plaintiff.

262.  To prevail on a *Brady/Giglio* claim against a police officer, Plaintiff must show: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense; (2) the suppression harmed the accused; and (3) the officer "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Mellen v. Winn*, 900 F. 3d 1085, 1096 (9th Cir. 2018).  "Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Id* at 1097 (quoting *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005)).  ""[W]here the prosecution fails to disclose evidence... that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial.'" *Mellen,* 900 F.3d at 1097 (citing *Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005)). "The prosecutor's obligation under is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado v. Gonzalez,* 758 F.3d 1119, 1135 (9th Cir. 2014)

263.  The complained of *Brady* violations include:

    a.  suppression of FBI witness statement given by Claudia Rissling describing skin tone of robbers not matching Plaintiff

b.  suppression of identity of rebuttal witness FBI agent Sonja Nordstrom who took down Claudia Rissling's witness statement

c.  suppression of photographs of shoe prints lifted from the scene of the robbery and crime lab analyses of shoe prints showing that it did not match Plaintiff's shoes

d.  omission from reports that there was no scent of pepper spray on the towel and t-shirt, interior of the getaway car, the interior of the Dodge Magnum, and coins;

e.  omission from reports the clear plastic bag containing a black stocking and coins covered with red dye was not found in the rear seat of Plaintiff's car

f.  suppression of cell phone records showing that Plaintiff was not at the scene of the robbery as well as the destruction of three cell phones

g.  suppression of 911 calls and Mobile Digital Transmissions describing physical characteristics of suspects not matching Plaintiff

264.  **Claudia Rissling's FBI Witnesss Statement, Identity of FBI Agent Nordstrom, and 911-calls and Mobile Digital Transmissions**: On December 14, 2005 on the day of the robbery, Claudia Rissling told FBI agent Nordstrom at the scene that the robber who came to her counter, was next to her, and wearing Converse shoes had medium complexion.  Claudia Rissling never did a police lineup identification of Plaintiff.  Defendants were in possession of 911 calls and Mobile Digital Transmissions describing physical characteristics of robbery suspects that do not match Plaintiff.  At the March 9, 2006 Preliminary Hearing, Plaintiff was sitting in court wearing prison garb next to defense counsel.  Claudia Rissling made an unreliable in-court identification of Plaintiff as having a similar "dark skin" tone as the robber who came to her counter, was next to her and wearing Converse shoes.  Claudia Rissling made the same in-court identification during the initial trial in 2007.  Claudia Rissling changed her description of the skin tone of the robber from "medium complexion" to "dark complexion" to match her in-court identification of Plaintiff.  Prior to the March 9, 2006 Preliminary Hearing,

the FBI, the People, and Defendants were jointly investigating the bank robbery. Defendants and the FBI jointly agreed to have Plaintiff prosecuted in State Court because it will result in a longer sentence. Defendants were aware the FBI took down a witness statement from Claudia Rissling because FBI agent Nordstrom, Defendants Murren and Brown were all at the robbery scene on December 14, 2005. Federal Grand Jury materials regarding the investigation of the bank robbery (not involving Plaintiff's prior conviction(s)) were turned over to Defendants but not turned over to Plaintiff during the pendency of the initial trial. Defendants were in possession of the FBI witness statement by Claudia Rissling and the identity of rebuttal witness FBI agent Nordstrom prior to the March 9, 2006 Preliminary Hearing and the March 2007 trial but never turned it over to Plaintiff. The significance of Claudia Rissling's in-court identification of Plaintiff as having similar "dark skin" tone as one of the robbers was underscored by the Court of Appeals upholding Plaintiff's conviction on direct appeal because bank tellers [Claudia Rissling] identification of Plaintiff as having the same or similar skin color, height and build as two of the robbers…" was strong circumstantial evidence of Plaintiff's guilt. (**Exh 18**, *People v. Tarkington*, Court of Appeal Second Appellate District Division One, B199860, 12/9/2008, at 7.) Furthermore, Claudia Rissling was the only witness who was able to positively identify Plaintiff as one of the robbers. Without the 911-calls, Mobile Digital Transmissions, FBI statement of witness Claudia Rissling, and identity of FBI agent Nordstrom (who took down Claudia Rissling's witness statement), Plaintiff was denied exculpatory and impeachment evidence to challenge the accuracy of Claudia Rissling's identification of Plaintiff.

265. **Photos of Shoe Prints from the Robbery Scene and Crime Lab Analyses of Foot Prints**: Photographs of shoe prints of the robbers next to rulers were taken at the robbery scene. Plaintiff's and Darris Allen's shoes were seized after they were arrested on December 14, 2005. Per Defendant Brown's case file, the shoe prints and sole patterns were sent to the crime lab to be analyzed. It is easy to discern that the sole patterns in the photos of the shoe prints do not match Plaintiff's or Darris Allen's shoes.

Yet, Defendant Brown conveniently asserts otherwise.  Defendants were in possession of the shoe prints and crime lab analyses prior to the March 9, 2006 Preliminary Hearing and the March 2007 trial but did not produce it to Plaintiff.  Plaintiff was denied evidence that was exculpatory and points to innocence as he was not the robber and the crime lab analyses supported it.

266.  **Omission of Exculpatory Facts from Reports:**  the deputies who arrested Plaintiff on December 14, 2005 noted in their reports that the recovered currency smelled of bleach. They never mentioned smelling pepper spray from the currency, bank dye, interior of the Dodge Magnum, or coins.  The arresting deputies did not find a clear bag containing a black stocking and coins covered in red dye in the rear seat of the Dodge Magnum and underneath a black jacket that they had searched and recovered some currency from.  Yet, Defendants Sergeant Young, Murren and Brown conveniently were able to find an alleged red dye-stained towel and t-shirt, a clear bag containing a black stocking and coins covered in red dye, and smelled pepper spray inside the Dodge Magnum and on the towel, t-shirt, and coins.  Defendants Sergeant Young, Murren and Brown omitted from reports that there was no scent of pepper spray on the coins, the towel and t-shirt, the interior of the Dodge Magnum, and interior of the getaway car. They also omitted from reports that the clear bag containing a black stocking and coins covered with red dye was not found in the rear seat of Plaintiff's car but instead was found somewhere else (it was most likely recovered by Defendant Brown when he was searching the getaway car on December 14, 2005).  Defendants Sergeant Young, Murren and Brown's omission of these facts from reports denied Plaintiff with impeachment evidence to show that there was no smell of pepper spray or red bank dye evidence recovered inside of Plaintiff's car that can physically link Plaintiff to the robbery.

267.  **Cell Phone Records and Destroyed Cell Phones:**  The FBI utilized Grand Jury subpoena to obtain cell phone records regarding the three (3) cell phones that were seized when Plaintiff was arrested on December 14, 2005.  The FBI turned over to Defendants the cell phone records prior to the March 2007 conviction.  Some of the cell

phone records show cell tower information, which can assist with showing the physical location of the cell phone. However, the cell phone records regarding Plaintiff's phone did not contain any cell tower information. After Plaintiff was convicted, he discovered Defendants were in possession of cell phone records. Plaintiff demanded and was given cell phone records that appear to be doctored as there was a gap where phone calls were not received or made from Plaintiff's phone. An inspection of Plaintiff's cell phone could have revealed that the cell phone records were doctored and manipulated. During the 2018 retrial, Defendants admitted to destroying the three (3) cell phones in violation of a Court Order to preserve it. The three (3) cell phones were useful because it could be used to show that the cell phone records were doctored and manipulated by Defendants. The combination of the three (3) cell phones and cell phone records would have shown Plaintiff was physically not at the robbery scene. Defendants' suppression of cell phone records in their possession denied Plaintiff exculpatory evidence to show that he was not physically near the scene of the robbery.

268. The actions of each defendant in withholding the aforementioned evidence were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth. Plaintiff was prejudiced by the non-production of the aforementioned *Brady* material as he was denied evidence that points to innocence.

269. The constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court was to conclude that the source of Plaintiff's right to *Brady* information is a constitutional source other than due process (such as the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is brought on those bases as well.

270. Defendants Sergeant Young, Murren, Brown, and Does 1-10 were each jointly and severally responsible to produce *Brady* information to Plaintiff. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein

and failed to prevent it, which each had a responsibility to do, and each ratified, approved, or acquiesced in it.

271.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

272.   As a result of each Defendants', and each of their, violations of Plaintiff's constitutional right to have *Brady* information turned over to Plaintiff, Plaintiff was deprived of his above described civil rights, and is entitled to damages including, but not limited to general and punitive damages and attorney's fees under 42 U.S.C. §1988, including attorney's fees for defending against the criminal charges and prosecuting this action.

## SIXTH CLAIM FOR RELIEF
### JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS
### 42 U.S.C. § 1983, *BRADY* VIOLATIONS
### (Against Defendants County of Los Angeles, Sergeant Young, Murren and Brown)

273.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

274.   Defendants County, Brown, Sergeant Young, Murren, and Does 1-10 were jointly and severally responsible as investigators assigned to the Tarkington case to share material information with each other, and to ensure that *Brady* information was turned over to Plaintiff.

275.   Each Defendant and Does 1-10, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to have *Brady* information as set forth above.  Each failure to provide *Brady* information, as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

276.   Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

277.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

278.   As a result of each Defendants', and each of their, violations of Plaintiff's constitutional right to have *Brady* information turned over to Plaintiff, Plaintiff was deprived of his above described civil rights, and is entitled to damages including, but not limited to general and punitive damages and attorney's fees under 42 U.S.C. §1988, including attorney's fees for defending against the criminal charges and prosecuting this action.

## SEVENTH CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS
## 42 U.S.C. § 1983, *MONELL* VIOLATIONS
### (Against Defendants County of Los Angeles, McDonnell and Sergeant Young)

279.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

280.   Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendants County, McDonnell, Sergeant Young and Does 1 – 10, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff and others similarly situated, engaged in the unconstitutional conduct and omissions as set forth above, which consist of the following customs and/or policies:

   a.   The knowing presentation of false evidence by deputy officers;

   b.   The deliberately indifferent presentation of false evidence by deputy officers;

**FIRST AMENDED COMPLAINT FOR DAMAGES**

64

c. The presentation of false evidence by deputies in reckless disregard for the truth or the rights of the accused;

d. The destruction of evidence that is material and exculpatory;

e. Officers' failure to provide material, exculpatory, and impeachment information to prosecutors trying the case involving the criminal defendant;

f. Failing to adequately train, supervise and control its officers in the investigation and use of evidence, including the prevention of unconstitutional use of fabricated evidence;

g. Failing to adequately train, supervise and control its officers to disclose to the deputy district attorney prosecuting a defendant all exculpatory and impeachment information, including *Giglio v. United States*, 405 U.S. 150 (1972) and *Brady* information, which would include alternative theories which would support the defense; the disclosure of witness statements who could not identify the criminal defendant; impeachment information concerning the witnesses and officers;

h. Failing to adequately discipline officers involved in dishonesty, fabrication of evidence, or otherwise abusing their authority;

i. Condoning and encouraging officers in the belief that they can violate the rights of persons such as Plaintiff with impunity, and that such conduct will not adversely affect their opportunities for promotion and employment benefits;

j. Condoning and encouraging the withholding and fabrication of evidence including but not limited to the filing of materially false police reports, concealing material evidence, concealing exculpatory evidence, concealing impeachment information, and/or making false statements to prosecutors to obtain the filing of false charges and obtaining false convictions.

281. Plaintiff is informed and believes and based thereon alleges that Defendants County, McDonnell and Sergeant Young adopted policies, customs and/or practices to

**FIRST AMENDED COMPLAINT FOR DAMAGES**

place undue burdens on criminal defendants to obtain material, exculpatory, and impeachment information from a peace officer's personnel file in violation of *Brady*, such as requiring a criminal defendant to file a *Pitchess* motion.  The *Pitchess* procedures violate *Brady* because *Brady* mandates that Defendants voluntarily turn over material, exculpatory, and impeachment information in a peace officer's personnel file but Plaintiff and others similarly situated must overcome a burdensome procedural hurdle in order to gain access to *Brady* material in a peace officer's personnel file.  Furthermore, in the event Plaintiff and others similarly situated are able to gain access into a peace officer's personnel file, it is limited to an arbitrary cap of 5-years.

282.   Plaintiff is informed and believes and based thereon alleges that Defendants McDonnell and Sergeant Young are agents of the Los Angeles County Sheriff's Department, a subdivision of Defendant County, and that Defendant McDonnell is the official policymaker for the Los Angeles Sheriff's Department.  These policies, customs and practices include (1) putting peace officers who fabricated and/or suppressed evidence on a watchlist of impeachable witnesses and prevent them from testifying on behalf of the prosecution to false evidence so as to prevent obstruction of justice; (2) disciplining peace officers who fabricated and/or suppressed evidence to convict suspects; and (3) not allowing peace officers to fabricate and/or suppress evidence to convict suspects.

283.   Defendant Sergeant Young was the supervisor of Defendants Murren and Brown when Defendants Murren and Brown were investigating the bank robbery on December 14, 2005 and thereafter, conducting the impound search of the Dodge Magnum on December 15, 2005, and testifying as a prosecution witnesses at the criminal trial in March 2007.  Defendant Sergeant Young's responsibility included recommending and implementing the customs, policies and procedures of the Los Angeles County Sheriff's Department while supervising, training, disciplining, and/or controlling Defendants Murren and Brown.

284.   Defendants Murren and Brown fabricated and suppressed evidence during the impound search of the Dodge Magnum on December 15, 2005 and investigation of the bank robbery, and they falsified police reports to cover up the false and suppressed evidence.   The People prosecuted Plaintiff based on Defendants Murren and Brown's fabricated and/or suppressed evidence.

285.   Defendant Sergeant Young knew or should have known of Defendants Murren and Brown's fabrication and suppression of evidence as Defendant Young was present during the impound search on December 15, 2005 and investigation of the bank robbery.   Defendant Young ratified and approved Defendants Murren and Brown's fabrication and suppression of evidence by (1) approving Defendant Brown's supplementary report dated December 30, 2005, which documented false and suppressed evidence obtained during the impound search on December 15, 2005 and investigation of the bank robbery; and (2) not disciplining Defendants Murren and Brown for seizing false evidence and suppressing exculpatory evidence (e.g. FBI witness statement of Claudia Rissling, cell phone records, and shoe prints).

286.   Defendants McDonnell and Sergeant Young encouraged the People to continue to use Defendants Brown and Murren as prosecution witnesses by not disciplining them for falsifying evidence, suppressing exculpatory evidence, and obstructing justice.

287.   Defendants County and McDonnell established the customs, policies and procedures of the Los Angeles County Sheriff's Department regarding putting peace officers who falsify evidence, suppress exculpatory evidence, and obstruct justice on a watchlist of non-credible witnesses and preventing them from testifying to false evidence on behalf of the prosecution.   Defendant McDonnell is responsible for putting such peace officers on this watchlist.   Defendant McDonnell failed to put Defendants Young, Murren and Brown on this watchlist after he discovered their misconduct while in office and prior to Plaintiff's retrial in 2018.   Defendant McDonnell ratified and condoned Defendants Young, Murren and Brown's misconduct by not putting them on the watchlist and

disciplining them upon discovering their misconduct while in office and prior to Plaintiff's retrial in 2018.   Defendant McDonnell ratified and condoned Defendants Murren and Brown's misconduct by not preventing them to be used as prosecution witness during Plaintiff's 2018 retrial and knowing that they will obstruct justice.   Even after Defendant Brown was put on the Officer and Recurrent Witness Information Tracking System ("ORWITS") list by the prosecution, Defendant McDonnell continued to fail to enforce customs, policies and procedures of not allowing peace officers to testify to false evidence on behalf of the prosecution thereby obstructing justice. Defendant McDonnell's failure to enforce and/or follow customs, policies and procedures exposed Plaintiff and others similarly situated to the risk of being prosecuted based on false evidence and thus obstruction of justice.   Indeed, during the retrial in 2018, Deputy District Attorney Shannon Sexton listed Defendants Murren and Brown on her witness list because they will be testifying about how they "searched the defendant's car after it had been impounded."   (**Exh 27**.)   Deputy District Attorney Shannon Sexton characterized Defendant Brown as "extremely necessary to the prosecution of this case." Thus, Deputy District Attorney Shannon Sexton was relying on Defendants Murren and/or Brown's false statements, false observations, fabricated evidence, misleading photos, fabricated reports, and planted evidence during the impound search on December 15, 2005 to retry Plaintiff in 2018.

288.   Defendants County, McDonnell and Sergeant Young maintained a policy and procedure of ratifying and condoning the deputies' fabrication of evidence and suppression of exculpatory evidence by not disciplining Defendants Murren and Brown for their misconduct of fabricating and suppressing evidence against Plaintiff.   The impact of this official policy is revealed by Defendant County allowing Deputy District Attorney Shannon Sexton listing Defendants Murren and Brown as prosecution witnesses during the 2018 retrial in spite of knowing that they had fabricated and suppressed exculpatory evidence during their investigation of the bank robbery.

289.   In spite of discovering Defendants Young, Murren and Brown's misconduct in falsifying and suppressing evidence, Defendants County and McDonnell took no disciplinary against them and continued to allow witnesses who committed obstruction of justice to act as prosecution witnesses in 2018.  Defendants Young and Murren were not placed on ORWITS in spite of their falsifying and suppressing evidence.  Such actions reveal an official policy and procedure by Defendant County to ratify and condone its deputies' misconduct in falsifying and/or suppressing evidence as set forth herein.

290.   The actions, or lack thereof, of the Defendants County and Sergeant Young set forth in this complaint were known or should have been known to the policymakers responsible for the Defendants and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or the substantial likelihood that constitutional rights would be violated as a result of failing to train, supervisor or discipline in areas where the need for such training and supervision was obvious.

291.   Defendants County and Sergeant Young's actions as set forth above were a motivating force behind the violations of Plaintiff's rights as well as other similarly situated criminal defendants as set forth in this complaint.

292.   As a direct and proximate result of the Defendants' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Defendants Brown, Sergeant Young, Murren and other peace officers Plaintiff has yet to identify, Plaintiff and other similarly situated criminal defendants sustained injury and damage.

293.   As a result of each of Defendants violations of Plaintiffs' constitutional rights, as set forth herein, Plaintiffs sustained injury and damage.

294.   As a result of this unconstitutional policy, practices and/or customs, criminal defendants, such as Plaintiff, have been denied material, exculpatory and impeachment information to defend against criminal charges arising from the investigation of the aforementioned peace officers

295.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

296.   Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees to defend against the criminal charges and prosecuting this action, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

## EIGHTH CLAIM FOR RELIEF

### VIOLATION OF CIVIL CODE §§ 51 ET. SEQ. AND 52

### (Against Defendants Sergeant Young, Murren and Brown)

297.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

298.   Defendants acting within the scope of their duties as County of Los Angeles police officers wrongfully caused Plaintiff to be arrested, put in jail, and subjected to criminal felony charges based upon his race and due to coercion, intimidation and threats, in violation of Civil Code §§ 51 et. seq. and 52.1.

299.   On December 14, 2005, Defendants Murren and Brown arrived at the robbery scene and were informed by witnesses that the three (3) robbers were black. Defendants Sergeant Young, Murren and Brown are not black.

300.   On December 15, 2005 and prior to going to the tow yard to search the Dodge Magnum, Defendant Murren obtained Plaintiff's criminal history and photograph. Upon confirming Plaintiff's race as an African American and seeing Plaintiff's criminal history and prior strikes, Defendant Murren shared it with Defendants Sergeant Young and Brown prior to and at the tow-yard when they searched the Dodge Magnum. Defendants Sergeant Young, Brown and Murren conspired and agreed to fabricate and suppress evidence to frame Plaintiff for the bank robbery because of his race as an

African American and criminal history.   By fabricating and suppressing evidence, Defendants Sergeant Young, Murren and Brown induced the People to file the Felony Complaint, misled the Judge to find probable cause to hold Plaintiff over to answer the Felony Complaint on March 9, 2006, and caused Plaintiff to be convicted by a jury. Defendants' misconduct denied Plaintiff fair and equal access to the accommodations or facilities of the Los Angeles Superior Court.

301.   Defendants intimidated Plaintiff by arresting him and causing him to be charged with robbery and incarcerated for over twelve-years when they knew or should have known that Plaintiff was not one of the robbers. When Plaintiff exercised his appeal rights and uncovered the individual defendants' fabrication and suppression of evidence, Defendants continued their intimidation and coercion by inducing the People to maintain its prosecution of Plaintiff based on false evidence so as to intimidate and coerce Plaintiff into accepting a plea deal to shield them from this civil action.   Due to Defendants intimidation and coercion, Plaintiff was subjected to ongoing prosecution by the People and unlawful incarceration.

302.   Pursuant to Cal. Govt. Code §815.2, Defendant County is hereby liable for the acts, omissions and conduct of its employees Defendants Brown, Murren, Sergeant Young, and Does 1-10 whose tortious conduct was a cause in the damages and injuries to Plaintiff.

303.   Plaintiff timely filed a Claim for Damages pursuant to Cal. Govt. Code §910 et. seq. This action is therefore timely.

304.   The conduct of the Defendants constituted interference by threats, intimidation, or coercion, or attempted interference, with the exercise of enjoyment by Plaintiff of rights secured by the Constitution or laws of the United States, or secured by the Constitution or laws of the State of California, including interference with Plaintiff's rights to be secure in his person and free from unlawful arrest under the Fourth Amendment and Cal. Const. Art. 1 sec. 13 as well as Cal Civ. Code § 43.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

305.   As a direct cause of Defendants' conduct, Plaintiff's rights pursuant to California Civil Code §52.1 were violated, causing injuries and damages in an amount to be proved at the time of trial.

306.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

307.   Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorney's fees to defend against the criminal charge and prosecute this action, will continue to incur attorney's fees, and pursuant to California Cal. Civ. Code § 52.1, Plaintiff is entitled to reasonable attorney's fees.

308.   The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et. seq. and punitive damages should be assessed against each individual Defendant, other than the County, for the purpose of punishment and for the sake of example.  Defendant County is liable for the acts of its employees as they have agreed with and/or ratified the acts of the individual defendants.

## NINTH CLAIM FOR RELIEF

## VIOLATION OF STATE DUE PROCESS, CAL CONST. ART. I § 7(a)

### (Against Defendants County of Los Angeles, Sergeant Young, Murren and Brown)

309.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

310.   This is a state law claim for damages in excess of the jurisdictional amount.

311.   At all times material times mentioned herein, the actions of Defendants Brown, Sergeant Young, Murren, County, and Does 1-10 were done in an intentional or negligent manner and, specifically, Defendants Brown, Sergeant Young, Murren acted in an intentional, negligent or careless manner and was reckless, grossly negligent or negligent in failing to abide or refusing to abide by Plaintiff's right to be free from

deprivation of liberty without due process.  In addition, these defendants failed to provide adequate remedial measures upon discovering that evidence was falsified, contaminated, or an investigation was corrupted by impermissible activities.

312.   Prior to the institution of this action, Plaintiff gave notice of this claim to the Defendant County and the Los Angeles County Sheriff's Department and performed all conditions precedent to this action including compliance with California Government Code Section 911.2.

313.   Plaintiff has been greatly humiliated and held up to public scorn and derision as a result of the foregoing acts of all Defendants.  Additionally, Plaintiff has been forced to incur substantial amounts for attorneys' fees to defend against the criminal charges and prosecute this action, investigation expenses, and other expenses in the vindication of his constitutional rights.

314.   In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

315.   As a direct, proximate and foreseeable result of Defendants County, Brown, Sergeant Young, and Murren's acts and omissions, Plaintiff suffered loss of life, liberty and freedom, and other privileges of free society resulting in mental anguish, loss of enjoyment of life, loss of reputation, discomfort, inconvenience, loss of time, loss of wages and other monetary losses; the injuries are permanent or continuing and Plaintiff will suffer such losses in the future.

## TENTH CLAIM FOR RELIEF
### FALSE IMPRISONMENT
**(Against Defendants County of Los Angeles, Sergeant Young, Brown and Murren)**

316.   Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

317.   As fully described above, Defendants Sergeant Young, Murren, and Brown falsified and suppressed evidence, which resulted in the criminal conviction and incarceration of Plaintiff for over twelve years until June 4, 2018 when the charges against him were dismissed by the District Attorney.

318.   Defendants Sergeant Young, Murren and Brown falsified and suppressed evidence on December 15, 2005 during the impound search of Plaintiff's car and conveyed their false and suppressed evidence to the People.  The People relied on the false and suppressed evidence to file the Felony Complaint on December 15, 2005 at 3:07 PM.  If the People and Judge were aware of the false and suppressed evidence, Plaintiff would not have been arraigned, incarcerated, and prosecuted for crimes he did not commit.

319.   Plaintiff has been greatly humiliated and held up to public scorn and derision as a result of the foregoing acts of all Defendants.  Additionally, Plaintiff has been forced to incur substantial amounts for attorneys' fees to defend against the criminal charges and prosecute this action, investigation expenses, and other expenses in the vindication of his constitutional rights.

320.   As a direct, proximate and foreseeable result of all the Defendants' acts and omissions, Plaintiff suffered loss of life, liberty and freedom, and other privileges of free society resulting in mental anguish, loss of enjoyment of life, loss of reputation, discomfort, inconvenience, loss of time, loss of wages and other monetary losses; the injuries are permanent or continuing and Plaintiff will suffer such losses in the future.

321.   The acts of Defendants Brown, Murren, and Sergeant Young as herein alleged, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages in an amount subject to proof at trial.

///

///

///

**FIRST AMENDED COMPLAINT FOR DAMAGES**

## ELEVENTH CLAIM FOR RELIEF

## NEGLIGENT HIRING, SUPERVISION, DISCIPLINING AND RETAINING DEPUTY SHERIFFS

### (Against Defendants County of Los Angeles and McDonnell)

322. Plaintiff hereby realleges and incorporates by reference all previous paragraphs, inclusive, as well as any subsequent paragraphs contained in the Complaint, as if fully set forth herein.

323. Plaintiff is informed and believes, and thereon alleges that Defendants Brown, Murren, Sergeant Young, and Does 1-10 each had a history and propensity for acts of the nature complained of herein and manifested such propensity prior to their employment as County of Los Angeles Deputy Sheriffs by Defendant County. Plaintiff is further informed and believes and thereon alleges that Defendant County knew, or in the exercise of reasonable care should have known of such prior acts at the time such individual defendants were hired by Defendant County. Defendant County's disregard of this knowledge or failure to adequately investigate and discover the facts constitutes negligent hiring.

324. Plaintiff is informed and believes and thereon alleges that after being employed and appointed as County of Los Angeles Deputy Sheriffs for and by Defendant County and Los Angeles County Sheriff's Department, and prior to the commission of the acts complained of herein, Defendants Brown, Murren, Sergeant Young, and Does 1-10, acting under the color of their authority as Los Angeles County Deputy Sheriffs, and in the course and scope of their employment as such, committed similar acts and inflicted similar injuries and damages upon other persons without reasonable cause or justification. Plaintiff is further informed and believe and thereon allege that Defendant County knew, or in the exercise of reasonable care, should have known of these prior acts and that such Deputy Sheriffs were unfit and prone to commit them but negligently failed to take steps to properly train, supervise, discipline and/or terminate the officer's employment.

325.   In 2013, Defendants County and McDonnell was put on notice by forensic testing by Peter Barnett that Defendants Sergeant Young, Murren and Brown fabricated evidence of bank dye and pepper spray on the towel and t-shirt to frame Plaintiff.  After discovering the misconduct, Defendants County and McDonnell ratified it by not disciplining Defendants Sergeant Young, Murren and Brown; but instead continued to employ them.  By not disciplining and continuing to employ Defendants Sergeant Young, Murren and Brown, Defendants County and McDonnell created a risk or hazard of Plaintiff and others similarly situated from being subjected to prosecution for crimes based on false evidence.  That risk or hazard materialized when Plaintiff was in fact prosecuted in 2018 for bank robbery and burglary based on Defendants Sergeant Young, Murren and Brown's false evidence, reports and statements.  Defendants Murren and Brown were listed as prosecution witnesses, and the witness list indicated that Defendant Murren continued to be employed by Defendant County at the time of the retrial.  If Defendant County had disciplined Defendants Murren and Brown for their misconduct in fabricating evidence during the impound search of the Dodge Magnum on December 15, 2005, the People would not have retried Plaintiff in 2018 based on the same evidence Defendants Sergeant Young, Murren and Brown fabricated during their investigation of the robbery and impound search of the Dodge Magnum on December 15, 2005. Defendants County and McDonnell's failure to discipline Defendants Murren and Brown constituted an endorsement of these deputies' fitness to continue to serve as sworn peace officers and prosecution witnesses for ongoing criminal prosecutions, including the retrial in 2018.   Although Defendants Sergeant Young, Murren and Brown committed misconduct in fabricating evidence, the People continued to rely on these sworn peace officers' cloak of credibility and use them as prosecution witnesses as they were never disciplined.  Indeed, the People confidence in and reliance on these sworn peace officers' as prosecution witnesses were displayed by Deputy District Attorney Shannon Sexton stating that Defendant Brown was "extremely necessary" to the prosecution of the case and without Defendant Brown she will have to dismiss the case.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

326.   Defendants County and McDonnell owed a duty of care to the citizens of the State of California and Plaintiff that its sworn peace officers are fit to enforce the law, to testify witnesses, and to investigate crimes.  Defendants County and McDonnell breached the duty of care by ratifying Defendants Sergeant Young, Murren and Brown's misconduct through failing to discipline and/or disregarding the risk or hazard they posed to Plaintiff and other criminal defendants.

327.   As a proximate result of the negligence of Defendants County and McDonnell, Plaintiff was damaged and injured as alleged in the preceding paragraphs.

328.   The aforesaid neglect, failure and refusal to instruct and train constituted execution of the policies, customs, and practices of Defendants County and McDonnell as well as the Los Angeles County Sheriff's Department.

329.   The aforesaid neglect, failure and refusal to instruct and train, and promulgation and enforcement of policies, practices and customs constituted an execution of the policies, practices and customs of the Defendants County and McDonnell.

330.   As a direct and proximate result of the foregoing, Plaintiff was deprived of his above described civil rights and is entitled to damages including, but not limited to general and punitive damages and attorney's fees, including attorney's fees for defending against the criminal charges and prosecuting this action

WHEREFORE, Plaintiff, LaMont Tarkington, requests relief on his own behalf as follows, and according to proof, against each Defendant:

1.     General and compensability damages in an amount according to proof;

2.     Special damages in an amount according to proof;

3.     Exemplary and punitive damages against each Defendant in their individual capacities, other than the County, in an amount according to proof;

4.     Cost of suit, including attorney's fees, under 42 U.S.C. 1988 and California Civ. Code §52.1 plus a multiplier of four (4);

5.     Interest as allowed by law;

**FIRST AMENDED COMPLAINT FOR DAMAGES**

6.    Injunctive relief barring Defendants from falsifying evidence and ongoing violation of *Brady*; and

7.    Such other relief as may be warranted or as is just and proper.

Respectfully submitted,

DATED:  January 27, 2019                    By:_____

Leo James Terrell, Esq.

## JURY DEMAND

Trial by jury on all issues is demanded.

Respectfully submitted,

DATED:  January 27, 2019

By:_____

Leo James Terrell, Esq.